Merrill *v.* Manufacturers Light and Heat Company, Appellant.

Argued September 25, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and KEIM, JJ.

*Robert W. Smith, Jr.* and *Edward S. Stiteler,* with them, *Smith, Best and Horn,* and *Courtney and Courtney,* for appellant.

*William S. Livengood, Jr.,* with him *Livengood and Braucher,* for appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, November 13, 1962:

This is an appeal from a decree of the Court of Common Pleas of Somerset County, sitting in equity, which determined the rights and duties of the respective parties under a right of way agreement over cer-

tain coal lands. The propriety of such determination is now before us.

The facts are not disputed. Involved are three tracts of land located in Brothersvalley Township, Somerset County: the first tract is the Homer Y. Fritz tract (hereinafter referred to as Tract No. 2); the second tract is the Zachariah Walker tract (hereinafter referred to as Tract No. 6); the third tract is the Martin Luther Fritz tract (hereinafter referred to as Tract No. 4). The three tracts are contiguous, Tract No. 4 being situated between Tracts Nos. 2 and 6. The appellant, The Manufacturers Light and Heat Company (Company), is the owner of an easement which traverses these three tracts and along which it has constructed and maintained for upwards of 30 years several thousand feet of natural gas transmission pipeline. The *present* owners of the coal underlying these three tracts *and* the surface, subject only to the Company's easement, are the appellees (Merrills).

The rights of way across these three tracts were obtained by the Company between December 22 and 30, 1930.[1] As of December 22, 1930, the ownership of these three tracts of land was as follows: the *surface* of Tract No. 4 was owned in fee by Charles A. Merrill, Sr. et ux.; the surface of Tract No. 6 was owned by Zachariah Walker; the *surface* of Tract No. 2 was owned by Homer Y. Fritz. The mining rights to the three seams of coal underlying Tracts Nos. 2, 4 and 6, with the exception of certain mining rights owned by Homer Y. Fritz in certain coal in Pine Hill #1 under Tract No. 2, had been vested in Blue Lick Coal Company (Blue Lick). In 1927, Blue Lick leased the exclusive right to mine all of its coal in two seams (the

---

[1] It must be noted that, although the Company is a public utility which has been vested by the legislature with the right of eminent domain, it chose to contract privately for these rights of way rather than obtain such rights by way of eminent domain.

Pine Hill #1—the uppermost vein— and the Pine Hill #2—the bottom vein) underlying these tracts to the Enterprise Coal Mining Company (Enterprise), a family corporation, all of the stock of which was and is presently held by the Merrill family. The mining rights to one seam (the middle or the Redstone vein) were not so leased and remained the property of Blue Lick. Enterprise assigned to Charles A. Merrill, Sr. its lease with Blue Lick.

On December 23, 1930 the Company obtained from Merrills a right of way across Tract No. 4 the surface of which Merrills owned. Inasmuch as Merrills then owned the mining rights under Tracts Nos. 2, 4 and 6 as assignee of the Blue Lick-Enterprise lease, there was included in this right of way agreement between the Company and Merrills a release running from the Company to Merrills of damages to the Company's pipelines caused by "the removal of the surface support thereunder" in connection with the mining of coal under Tracts Nos. 2, 4, and 6. It is the construction and interpretation of this right of way agreement which is the crucial issue on this appeal. Merrills presently hold full title to both the *surface* and the *three seams of coal* underlying Tracts Nos. 2, 4 and 6. These estates were acquired subsequent to 1930 by various real estate transactions and mortgage foreclosures.

No dispute arose between the parties until October 1955 when Merrills requested the Company to remove its entire footage of pipeline traversing the three tracts. The Company was notified that Merrills intended to mine the area of Tracts Nos. 2, 4 and 6, including the area along the right of way, by the open pit or strip mine method.[2] Such strip mining clearly

---

[2] ". . . Strip mining, as the term indicates, is the stripping away of the earth surface and the horizontal withdrawal of the mineral deposits at hand. Shaft mining involves the sinking of a vertical shaft into the ground and the developing from that point

could not be accomplished prior to the removal of the pipeline without interrupting the Company's service of natural gas to Somerset County communities. Merrills based their request for removal of the pipeline on the 1930 right of way agreement. The Company refused to accede to Merrills' request. Merrills brought an action in equity against the Company in the Court of Common Pleas of Somerset County seeking, in the alternative, that the Company be required to remove its pipeline or pay money damages resulting from Merrills' inability to mine the underlying coal averred to be in excess of 79,000 tons of readily marketable coal. The chancellor enjoined the Company from interfering with Merrills in the mining of coal under the three tracts by any method of mining as the Merrills shall determine and held the Company liable to Merrills for all losses and damages as Merrills have and will sustain by reason of any wrongful interferences by the Company with Merrills in the mining of the coal. From that decree this appeal was taken.

The basic issue raised on this appeal is whether the parties intended by the right of way agreement that the Company's easement could be terminated at the option of Merrills when at some future undetermined time Merrills elected to strip mine the three tracts over which the Company's easement ran. This issue can only be resolved by determining what the parties *intended* by the language employed in this agreement, considering as immaterial for the purpose of this opinion the fact that both the surface, subject to the ease-

of tunnels and galleries which serve as vantage points from which to withdraw and lift the coal deposits through the shaft. Shaft mining does a minimum of damage to the outer crust of the earth; strip mining does a maximum of damage. Strip mining is effected through steam shovels and bull dozers which turn up the top layer of the earth . . .": *Rochez Bros., Inc. v. Duricka*, 374 Pa. 262, 265, 97 A. 2d 825.

ment, and mineral rights of the three tracts in issue have come to vest in Merrills since the 1930 agreements.

The law presently applicable is clear. A right of way is an easement (*Tide Water Pipe Co. v. Bell*, 280 Pa. 104, 124 A. 351) which may be created by an *express* grant, such as the present right of way agreement. To ascertain the nature of the easement created by an express grant we determine the intention of the parties ascertained from the language of the instrument. Such intention is determined by a fair interpretation and construction of the grant and may be shown by the words employed construed with reference to the attending circumstances known to the parties at the time the grant was made.[3] Ambiguous words are to be construed in favor of the grantee: *Hammond v. Hammond*, 258 Pa. 51, 101 A. 855. The grant of an easement is subject to the same rules of construction as other contracts: *Percy A. Brown & Co. v. Raub*, 357 Pa. 271, 54 A. 2d 35. In *Commonwealth v. Fitzmartin*, 376 Pa. 390, 393, 102 A. 2d 893, involving a deed of coal lands and mining rights, we held that: "Where a deed or agreement or reservation therein is obscure or ambiguous, the intention of the parties is to be ascertained in each instance not only from the language of the entire written instrument there in question, but also from a consideration of the subject matter and of the surrounding circumstances: [citing a case]." The recent case of *Wilkes-Barre Twp. School District v. Corgan*, 403 Pa. 383, 386, 170 A. 2d 97 reiterates this rule of construction. Particularly apt is the language of the late Mr. Justice STEARNE in his dissent in *Commonwealth v. Fisher*, 364 Pa. 422, 433, 72 A. 2d 568: "The burden rests upon him who seeks to

---

[3] Neither the Company nor Merrills have raised any issue involving the parol evidence rule on this appeal.

assert the right to destroy or injure the surface. There exists no applicable statutory enactment. The defendant must rely upon a construction of the words of the reservation . . . *Such words must be interpreted in the light of the apparent object or purpose of the parties and of the conditions existing when the words were employed.* (Emphasis supplied)" Our course is clear. In the first instance, we look first to the language of the right of way agreement of 1930 and, if an ambiguity exists, we then consider all the attending circumstances existing at the time of agreement so as to determine the "apparent object" of the parties.

The right of way agreement between Charles A. Merrill, Sr. and the Company, in pertinent part, provides: "As a part consideration for the within grant the Company by the acceptance hereof does hereby agree to pay any damages to crops incurred by the laying of the original pipelines as well as the damages incurred in the re-laying, etc., thereof. It also remises (sic) and releases the Grantor, and the Enterprise Coal Mining Company, with which he is connected, of and from any damages to the said pipeline or pipelines, by the removal of the surface support thereunder in the mining of the coal owned by him or it on the above described tract [Tract #4] and on the tracts of land locally known as the Zachariah Walker Tract [Tract #6] and the Homer Fritz Tract [Tract #2] which are adjoining tracts to the one herein described and under which he or the Enterprise Coal Mining Company are the owners or Lessees of the Minerals."

The initial and most vital matter to be considered is the construction of that portion of the agreement which states: "It [the Company] remises (sic) and releases the Grantor [Merrills] . . . from any damages to the said pipeline . . ., *by the removal of the surface support thereunder in the mining of the coal* . . . on the above described tract [#4] and on the tracts of land lo-

cally known as the Zachariah Walker Tract [#6] and Homer Fritz Tract [#2] . . . ." (Emphasis supplied) Specifically, what did the parties intend by the phrase *"by the removal of the surface support thereunder in the mining of the coal."*?

The term "surface support" has been considered from time to time by this Court: *Commonwealth v. Fitzmartin,* supra; *Commonwealth v. Fisher,* supra; *Rochez Bros. v. Duricka,* 374 Pa. 262, 97 A. 2d 825. More particularly, the word "surface" was recently defined in *Wilkes-Barre Twp. School District v. Corgan,* supra, at pages 387-388: "Where, however, the surface is granted to one and the underlying coal to another, the 'surface' includes whatever earth, soil or land which lie above and is superincumbent upon the coal: [citing cases]." It would follow, therefore, that what the parties intended by the removal of "surface support" was the removal of that subterranean geological matter which supports the "earth, soil or land", to wit, the removal of the coal and the rocky or sand strata which lies between the coal measures. Such is the construction given the term in other jurisdictions which have long dealt with coal mining problems: *Tate v. United Fuel Gas Co.,* 137 W. Va. 272, 71 S.E. 2d 65; *Gearhart v. McAlester Fuel Co.,* 199 Ark. 981, 136 S.W. 2d 679. To reiterate, the release for damages done to the Company's pipelines was for damages caused by the weakening of the surface strata upon which the pipelines rested *by the removal of the lower supporting strata of coal and other mineral matter.* Patently, *surface support* is not synonymous with *surface destruction* which, as a matter of course, accompanies strip mining: *Rochez Bros. v. Duricka,* supra. Surface support, known in Pennsylvania as the "third estate" of land ownership, is simply the support of the surface strata during the course of or following the removal of the lower strata.

The parties to this agreement were bound to know the meaning of their words and these words will be construed most strictly against him who chooses them: *Wilkes-Barre Twp. School Dist. v. Corgan,* supra. Charles A. Merrill, Sr. is a coal operator of some experience and the Company is a public utility company which furnishes domestic natural gas via pipeline in a bituminous coal-mining region. The meaning of the term "surface support" and the consequences of its removal should have been well known and understood by both parties. The phrase "surface support" is no esoteric word of art known only to the mining engineer, but it is a term generally understood by anyone familiar with the coal-mining regions of this Commonwealth. Given its ordinary meaning, the removal of surface support refers to tunnel, drift, or deep mining and, without additional words of qualification, it cannot be distorted into meaning removal by strip mining. Strip mining, though not widely practised in Somerset County in 1930, was not unknown.[4] Therefore, if the Merrills had intended to strip mine this area at some future time or if the Company had foreseen that the area was to be strip mined, words purporting to accommodate this exigency could and should have been used in the agreement. In the absence of any such words, we are bound to give to the phrase "removal of the surface support" its ordinary and common meaning and to hold that the parties intended that the phrase was used in reference to subterranean or deep, and not to strip mining.

The word "thereunder" in the phrase "the removal of the surface support *thereunder*" confirms this construction of the agreement. The converse of *"thereunder"*, namely, *"thereupon"*, was used in *Rochez,* su-

---

[4] Strip mining is neither novel nor a recent method of mining: *Commonwealth v. Fisher,* supra, p. 426.

pra, but because the agreement in that case was couched in words unquestionably referring to deep mining, the court held that "the right to enter in, upon, and under the lands . . . for the purpose of mining" did not grant a license to strip mine the area in question. The word "upon" was used in the deed in *Fisher,* supra, but it was accompanied by the phrase "the right to dig, excavate or penetrate any part of the said premises" which clearly implied the right to strip mine. In the case at bar, the word "thereunder" acquires significance when linked with the phrase "the removal of the surface support thereunder". Holding as we do that "the removal of the surface support", in common vernacular, refers to deep mining, the modifying word "thereunder" reenforces this construction. Construed and considered in its entirety, the phrase logically refers to subsurface or deep mining operations and only by the most distorted and strained reasoning can it be given another meaning. The conclusion is inescapable that what the parties intended by the phrase "the removal of the surface support thereunder" was the continuation of activity in which the Merrills were actively engaged at the time of the execution of the agreement; to wit, tunnel or deep mining the Pine Hill #1 and the Pine Hill Veins underlying Tracts Nos. 2, 4, and 6. Unlike *Rochez* and *Fisher,* there are here present no other words describing more fully the type of mining operation contemplated by the parties. We are bound by the words as used in the instrument and such words refer clearly to deep, not strip mining.

The release given to Charles A. Merrill, Sr. by the Company included damages resulting from the "removal of the surface support" under Tract No. 4 and: "on the tracts of land locally known as the Zachariah Walker Tract [Tract No. 6] and Homer Fritz Tract [Tract No. 2] which are adjoining tracts to the one herein described [Tract No. 4] and under which he

[Charles A. Merrill, Sr.] or the Enterprise Coal Mining Company are the owners or Lessees of the Minerals." Bound as we are to look to all the circumstances attending the execution of the right of way agreement, we must consider the status of the Merrills' mining rights on December 30, 1930.

The first owner of the mining rights, *so far as presently pertinent,* was one Fred E. Rowe who conveyed his rights in 1923 to one Daniel B. Zimmerman to secure a purchase money mortgage. Zimmerman in turn assigned the mortgage to the Union Trust Company of Pittsburgh. An examination of this mortgage reveals that when the coal rights were originally conveyed, the parties to the grants envisioned the removal of the minerals "under" the tracts. This notwithstanding, the mortgage also shows that there were certain reservations existing on these tracts created by the grantors of the coal rights. On Tract No. 2, the grantor had stipulated that the grantee or its assigns was to compensate for any damage done to the surface which would render the land unfit for agriculture and which would interfere with the flow of existing springs. On Tract No. 4, the grantor forbid any mining whatsoever within a three acre island around the existing farmhouse and outbuildings and the removal of any surface coal or limestone necessary for agricultural and domestic use. On Tract No. 6, the mining rights were granted as follows: "Together with all necessary rights and privileges to mine the same by drifting from the eastern side of the hill of which this [grantor's] land is the top, but not to mine by digging any shaft or holes upon the surface of said land." Blue Lick through its agent, Fred E. Rowe, leased the mining rights under the three tracts to Enterprise which lease was ultimately assigned to Charles A. Merrill, Sr. This leasehold agreement expressly stated that: ". . . the lessor [Blue Lick] grants *only such rights and privi-*

*leges as it possesses or has acquired in connection with the ownership of the coal covered by this agreement* and that in mining, removing and carrying away said coal the *lessee shall be limited to the exercise of the aforesaid rights and privileges.*" (Emphasis supplied) Therefore, on December 30, 1930, Charles A. Merrill, Sr. under his lease with Blue Lick was not able to strip mine the coal underlying Tracts Nos. 2 and 6, although he could do so on Tract No. 4 as he was the owner of the surface. No destruction of the surface was permitted on Tracts Nos. 2 and 6 as Merrill was bound by the reservations of the original grantors of the mining rights.

The lease between Blue Lick and Enterprise covered only two of the three coal measures underlying Tracts Nos. 2, 4, and 6, to wit, the uppermost vein or Pine Hill #1, and the bottom vein of Pine Hill #2. The middle or Redstone Vein was not leased by Blue Lick. More specifically, the lease included on Tract No. 2 only a portion of the underlying coal. The surface owner of Tract No. 2, Homer Y. Fritz, retained ownership of sixty acres of the Pine Hill #1 Vein and all of the coal underlying a two and one-half acre tract within Tract No. 2. The lease did cover all of the coal in the Pine Hill #1 Vein and the Pine Hill #2 Vein underlying Tracts Nos. 4 and 6. Therefore, on December 30, 1930, Charles A. Merrill, Sr. had mining rights to about 50% of the coal in the Pine Hill #1 Vein underlying Tract #2, but he could not strip mine it because he did not own the surface. Furthermore, he could not have strip mined the Pine Hill #2 Vein without destroying the middle or Redstone Vein to which he had no mining rights. Because Merrill owned the surface rights to Tract No. 4, he could have strip mined the Pine Hill #1 Vein but not the Pine Hill #2 Vein because it would have resulted in the destruction of the Redstone Vein. On Tract No. 6,

Merrill could not have strip mined either the Pine Hill #1 Vein because he did not own the surface or the Pine Hill #2 Vein because he had no right to excavate through the middle vein. Therefore, on December 30, 1930, Charles A. Merrill, Sr. had the right to strip mine only the Pine Hill #1 Vein on Tract No. 4. The only logical conclusion from the foregoing is that, when Merrill signed the right of way agreement, he did not intend by his words to include strip mining as an essential term of the agreement for the very logical reason that at the time he had no right to strip mine the entire area covered by the agreement, but only a very small and isolated portion thereof. Considering the words used in the agreement itself in the light of these surrounding circumstances, it seems clear that the only proper construction of the right of way agreement is that the parties thereto did not envision or contemplate the strip mining of Tracts Nos. 2, 4, and 6.

Another aspect of this agreement, which, although not decisive, does warrant consideration, is the character of the surface of the land at the time of the agreement apart from the coal thereunder. Clearly, the parties who owned the surface rights to Tracts Nos. 2, 4 and 6 and gave the rights of way to the Company contemplated the continued agricultural use of the land, at least for some time in the future. Each of the three rights of way agreements across Tracts Nos. 2, 4 and 6 contained almost similar wording which required the Company to pay any damages to crops incurred by the laying of the original pipelines as well as the damages incurred in the relaying, etc. thereof. Certainly, when there is no limitation placed in the right of way agreement, the owner of the surface is not obligated to use the land for that purpose which existed at the time of the agreement ad infinitum. However, the statement of the character of the land as agricultural and the specific releases for damages to crops and fences is in-

dicative of the state of mind of the parties to the agreement. Had *either* party envisioned that strip mining would replace farming on the three tracts, they could have, specifically or by implication, provided for such an occurrence. Strip mining would have of necessity rendered useless the release in this matter and if the parties had intended or foreseen its use, they would surely have carefully provided for it in their agreement. This Court cannot impute to a party to an agreement an unreasonable state of mind at the time of its execution. Why, therefore, should this Company have given a release which would have resulted in the utter destruction of its pipeline across these three tracts and the suspension of its natural gas service for an unforeseeable time? If the Company had foreseen that the area would be ultimately strip mined, would it have chosen this particular path for the erection of its pipeline? All of these questions are crucial in arriving at the intention of the parties to this agreement. It is not at all unreasonable to decide that the Company justifiably relied on the representation of Charles A. Merrill as expressed in the words of the agreement, to wit, that the surface was to be used for agricultural enterprises and the under-strata would be mined by tunneling or drifting wherever possible.

Since the resolution of this appeal rests upon the interpretation of the right of way agreement between Merrills and the Company, we are bound by the terms and language of the document and the circumstances attending its execution. We, therefore, are constrained to hold that it was the intention of the Company to release the Merrills from damages resulting from deep mining subsidence *only* and that this is the only meaning of the release contained in this agreement. Merrills cannot now demand the removal of the Company's pipelines and thereby revoke the grant of easement by relying upon the agreement of 1930. There is patently

no provision in the grant of this easement which would justify its termination because the grantee now desires after thirty-two years to strip mine the area.

Decree reversed. Costs on appellee.