403 A.2d 558

**Charles E. LEASE and Jack E. Lease, Appellants,**

v.

**John H. DOLL, Sr., and Florence H. Doll, Appellees.**

**Appeal of Charles E. LEASE.**

Supreme Court of Pennsylvania.

Argued May 24, 1979.

Decided July 5, 1979.

616

Kenneth A. Wise, York, Alan Linder, Lancaster, for appellants.

Jeffrey C. Bortner, York, for appellees.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

On June 25, 1974, appellant, Charles E. Lease, and his son ("the Leases") filed a complaint in equity seeking to enjoin John H. Doll, Sr. and Florence H. Doll ("the Dolls") from preventing access by motor vehicle to the landlocked property of the Leases by way of a right of way running over the land of the Dolls. On July 16, 1974, the Dolls filed an answer and counterclaim.[1] The answer to the complaint

1. In the counterclaim, the Dolls averred that, by preparing the right of way for vehicular use, the Leases trespassed on the land of the Dolls and that the size and location of the Leases' land prevented construction of sewage facilities in compliance with the Pennsylvania Sewage Facilities Act, Act of January 24, 1966, P.L. (1965) 1535, §§ 1 *et seq.*, 35 P.S. §§ 750.1 *et seq.* The Dolls requested an injunction preventing the Leases from trespassing on their land and prohibiting the Leases from occupying their premises in violation of the Pennsylvania Sewage Facilities Act. The "sewage" issue was resolved by a pre-hearing stipulation of the parties. The Leases stipulated they would not occupy the building upon their land until they complied with all pertinent regulations of the Pennsylvania Department of Environmental Resources and of Manheim Township, York County.

contended the right of way was a footpath of a width of not more than three feet and, therefore, not of sufficient width to accommodate motor vehicle use. Following the denial of preliminary motions, the chancellor conducted an evidentiary hearing and subsequently issued an adjudication and decree nisi. This decree nisi, dated July 3, 1975, was favorable to the Leases. The Dolls petitioned for a rehearing, and the chancellor opened the first decree nisi and conducted a second evidentiary hearing. On February 13, 1976, the chancellor issued a second adjudication and decree nisi which declared the right of way "to be of sufficient width to provide for reasonable and convenient travel by foot, but not of sufficient width to provide for access by motor vehicle."

Subsequently, the Leases, with the court's permission, deposed an additional witness and submitted the transcribed notes of testimony of the deposition to the court. After considering these notes of testimony, the chancellor reaffirmed the second decree nisi. Exceptions to this decree nisi were filed and argued before the court en banc. The court en banc dismissed the exceptions and adopted the second decree nisi as a final decree. An appeal was taken to the Superior Court which affirmed the final decree. *Lease v. Doll*, 256 Pa.Super. 226, 389 A.2d 1096 (1978) (dissenting opinion by Spaeth, J., joined by Van der Voort, J.). We granted a petition for allowance of appeal.

The relevant facts as found by the chancellor and supported by the record are as follows:

The Leases are joint owners of approximately .7 acres of land in the village of Glennville, Manheim Township, York County. A frame dwelling stands on the property. The Dolls jointly own land contiguous to the Leases' property which separates the same from an improved public road. The sole means of access to the Leases' land is a right of way running over the Dolls' property.

In 1952, the common owner of both the Leases' land and the Dolls' land conveyed the Leases' land to one of the Leases' predecessors in title and reserved the land now owned by the Dolls. Because the conveyed parcel was

completely landlocked, the deed conveying the property expressly granted the predecessor in title a right of way over the land reserved by the grantor. The pertinent clause[2] of the deed reads:

"UNDER AND SUBJECT to the following restriction: That a right-of-way is granted to the grantees and their heirs and assigns leading from the southeast corner southward on the west side of the stream of water from the said corner to the public road. That the grantees and their successors may at all times have the right to use same as an outlet from the premises hereby conveyed to the public road."

The right of way follows the stream which marks its eastern boundary and extends from the public road to the southern border of the Leases' property.[3] The ground immediately adjacent to the stream is soft and damp and, on occasion, is impassable by a motor vehicle.

Prior to and at the time of the severance of title by the common owner, residents of the area used the western bank of the subject stream as a footpath for travelling between the public road bordering the Dolls' property and a public road located somewhat north of the Leases' land. In 1953, the common owner sold his land, the servient tenement. Shortly thereafter, the original owner of the dominant tenement transferred her interest in the property.[4] Although motor vehicles were in general use in 1952, the original owner of the Leases' property did not own an automobile. With rare exception, from the severance of title until the Leases purchased the dominant tenement, access to the Leases' property has been by foot. Further, since the sever-

2. This clause is recited in the Leases' deed to their property and in the chain of title from which the Leases take title to their land.

3. The chancellor made no finding of fact regarding the length of the right of way. However, witnesses at the two evidentiary hearings conducted by the chancellor offered estimates of length ranging from sixty feet to two hundred and fifty feet.

4. Neither the common owner nor the original owner of the dominant tenement appeared as witnesses at the two evidentiary hearings conducted by the chancellor.

ance of title, the owner of the servient land has occasionally cultivated the property in a manner which reserved only a footpath along the bank of the stream.

In 1966 or 1967, one of the prior owners of the servient land created a parking area for his own motor vehicle. This area was along the public road and west of the right of way. The owner's actions resulted in an embankment defining the eastern edge of the parking area and limiting the area adjacent to the stream to a width of twelve to fourteen feet. The chancellor found this parking area was not constructed with the purpose of defining or limiting the right of way. At certain times of the year, wood pilings or "brush" were piled on the embankment to the parking area, and a portion of the area which could be used to travel to the dominant tenement was reduced to a footpath. The embankment and the "brush" were present and visible when the Leases and the Dolls acquired their respective tracts of land.

The Dolls purchased their property in 1971 and the Leases acquired theirs in 1974. Shortly after purchasing the land, the Leases attempted to dump stones along what they considered to be the right of way. The stones, which were intended to prepare the soft and damp ground for vehicular use, were dumped in the area adjacent to the stream and to a width sufficient for a motor vehicle to pass over. The Dolls halted the addition of the stones and constructed a fence on their property which effectively limited the right of way to a footpath.

Our task is to determine whether the decree of the trial court, which allowed for pedestrian "use" but not vehicular "use," improperly limited the Leases' expressly granted general right of way over the Dolls' land. This task is complicated by the fact that this express general grant does not specify the "width" of the intended right of way.[5]

\* \* \* \* \* \*

5. Although we view the crucial issue in this case as the intended "use" of the right of way, we cannot ignore the chancellor's emphasis on the "width." The chancellor phrased the issue in this case as "whether the right-of-way is limited to the width required for a

 The law presently applicable is clear. A right of way is an easement. *Merrill v. Mfgrs. Light and Heat Co.*, 409 Pa. 68, 185 A.2d 573 (1962). In ascertaining the scope of an easement created by an express grant, the intention of the parties to the grant must be advanced. See *Sigal v. Mfgrs. Light and Heat Co.*, 450 Pa. 228, 299 A.2d 646 (1973). "Such intention [of the parties] is determined by a fair interpretation and construction of the grant and may be shown by the words employed construed with reference to the attending circumstances known to the parties at the time the grant was made." [Footnote omitted.] *Merrill v. Mfgrs. Light and Heat Co.*, supra, 409 Pa. at 73, 185 A.2d at 575. Moreover, when the terms of an express grant of an easement are general, ambiguous, and not defined by reference to the circumstances known to the parties at the time of the grant, the express easement is to be construed in favor of the grantee, see *Hammond v. Hammond*, 258 Pa. 51, 101 A. 855 (1917), and the easement may be used in any manner that is reasonable. See *Dowgiel v. Reid*, 359 Pa. 448, 59 A.2d 115 (1948); *Garan v. Bender*, 357 Pa. 487, 55 A.2d 353 (1947); *Bowers v. Myers*, 237 Pa. 533, 85 A. 860 (1912).

footpath or is of sufficient width for vehicular traffic." We conclude that the chancellor's manner of phrasing the issue is of no moment and that we have properly stated the issue in terms of the intended "use" of the right of way. Although the chancellor emphasized the "width," a review of the second adjudication and decree demonstrates that in determining the "width" the chancellor considered evidence relating to the "use." Only after determining the intended "use" could the chancellor establish the "width" of the right of way. This approach complies with the general line of authorities. In 28 ALR 2d 253 (1953), the commentator noted:

"The dominant idea seems to be that the way allowed for is one of reasonable width, taking into consideration the character and situation of the property, *the circumstances affecting the use*, and the purposes to be served.

"It is well settled that when the grant is silent as to the width the way will be held to be of such width as is *suitable and convenient for the ordinary uses of free passage*, and if the particular object of the grant of the way is stated, the width must be suitable and convenient with reference to that object." [Emphasis added.] Thus, even if we were to phrase the issue in terms of "width," the underlying and crucial issue is the intended "use" of the right of way.

■ Instantly, the language of the general grant is ambiguous regarding the intended use of the easement. The grant only describes the easement as running southward on the west side of the stream and does not specify the use contemplated by the parties.[6] After a fair interpretation and construction of the language of the grant, the only unambiguous term is the purpose of the easement, namely, the easement was to serve as an outlet from the Leases' land to the public road adjacent to the Dolls' property.

■ Also, the intended use is not ascertainable when the grant of the easement is construed with reference to the attending circumstances known to the parties at the time the grant was made. The common owner of the two tracts of land and the original owner of the dominant tenement did not appear as witnesses in this case. However, persons who lived in the area at the time of the severance of title and who were familiar with the area did appear as witnesses. The only relevant facts[7] offered by these witnesses and considered by the chancellor are that, prior to and at the time of the severance of title, residents of the area used the western bank of the stream as a footpath for traveling between the public road bordering the Dolls' property and a

6. We note the grant also does not specify the intended width of the easement. Any specification regarding the width of the easement, i. e. three feet or fourteen feet, would be relevant in determining the use of the easement contemplated by the parties.

7. The chancellor considered not only the facts available to the parties at the time the grant was made, i. e. those discussed in the text, but also erroneously considered the actions of the persons who held title to or resided on the respective properties *after* the common owner and the original owner of the dominant tenement. Based on the facts discussed in the text *and these subsequent actions,* the chancellor concluded the "ambiguity in the [grant of the easement] has been resolved by long standing use" and "the parties to the original transaction intended to create a footpath when the 1952 deed was written and recorded." In effect, the chancellor attributed to the parties to the original grant knowledge of facts and circumstances occurring after these same parties had conveyed their interests in the properties to other persons. Thus, the chancellor improperly determined the intention of the original parties. Only the attending circumstances known to the parties *at the time of the grant* are relevant when construing a grant of an easement. See *Merrill v. Mfgrs. Light and Heat Co.*, supra.

public road located somewhat north of the Leases' land; that the ground immediately adjacent to the stream is soft and damp; and, that the original owner of the dominant tenement did not own an automobile. We conclude these relevant facts are insufficient to establish the parties intended the easement to be used solely as a footpath.

The parties to the original grant were aware that residents of the area used the western bank of the stream as a footpath. However, the grant of the easement fails to mention this prior use. It is reasonable to conclude that, had the parties intended to limit the easement to this prior use, they would have specified this limitation. See e. g., *Taylor v. Heffner*, 359 Pa. 157, 58 A.2d 450 (1948) (the words "as now used" were included in the grant and referred to the location of the easement). Also, the nature of the ground adjacent to the stream[8] and the original grantee's lack of an automobile[9] do not limit the granted easement to pedestrian use. Although the two preceding facts were within the parties' knowledge at the time of the grant, the parties also knew motor vehicles were in common use in 1952. The grant of the easement does not specifically exclude motor vehicle use. Clearly, an exclusion of such a commonly used means of transportation would be an unusual limitation. If the parties had intended such an unusual limitation, a reasonable inference is that they would have expressly stated the limitation in the grant creating the easement. Thus, the general and ambiguous language of the express grant is not clarified by reference to the attending circumstances known to the parties at the time of the grant. Therefore, while construing the instant easement in favor of the grantee, see *Hammond v. Hammond*,

8. Although on occasion, the nature of the ground adjacent to the stream makes the area impassable by a motor vehicle, the mere addition of "stones" makes the area suitable for vehicular use.

9. We note that the scope of an easement is not diminished because the owner of the benefited land failed to immediately use the easement to the fullest extent allowable. See *Hammond v. Hammond*, supra.

supra, we must determine whether vehicular use of the easement is reasonable. See *Garan v. Bender,* supra.

In *Piper v. Mowris,* 466 Pa. 89, 351 A.2d 635 (1976) [hereinafter: *Piper*], a case factually similar to the instant case, the issue before this Court was the nature and extent of an easement granted in general terms. There, as in the instant case, the easement benefited a landlocked property and the owner of this property sought to use the easement for vehicular use. Throughout the chain of title, the easement was conveyed by either of the following clauses: "Together with the use of the right of way to the public road" or "Together with a full right of ingress and egress to a public road." After reiterating the general legal principle that an express easement granted in general terms must be construed to include any reasonable use, see *Garan v. Bender,* supra; *Bowers v. Myers,* supra, we held vehicular use of the easement was a reasonable use. In *Piper,* we said:

"While the facts in this case indicate that the right of way was used infrequently for vehicular use, we are also mindful of the facts, as pointed out by the court below, that the appellant, Harold O. Mowris, is land locked. To deny him the use of vehicles over the right of way would, for all practical purposes, render the land useless since there is no other means of ingress or egress onto the Mowris tract."

*Piper,* 466 Pa. at 101, 351 A.2d at 641. Our reasoning in *Piper* is controlling instantly.[10]

**10.** The majority of the Superior Court acknowledged the *Piper* decision, but ruled the decision was inapposite to the instant case. The majority reasoned the rationale of *Piper* is only applicable so long as the permitted use does not change the size or location of the easement. Here, although the grant did not specify the width of the easement, the majority, citing our decisions in *Taylor v. Heffner,* supra, and *Krauts' Appeal,* 71 Pa. 64 (1872), concluded subsequent use of the easement established the width to be sufficient to accommodate only pedestrian use. Thus, the court ruled that permitting vehicular use would change the established width of the easement. We need not decide whether, when the width of an easement will be altered, the rationale of *Piper* is inapplicable.

We suggest the majority of the Superior Court has misapplied our decisions in *Taylor v. Heffner,* supra, and *Krauts' Appeal,* supra. In

■ Instantly, the Leases' contemplated use of the easement is a reasonable use. Although the easement was rarely used for vehicular use in the past, such use would not unreasonably interfere with the use of the servient tenement by the Dolls. The easement, which runs parallel to one side of the Dolls' land, provides the *only* means of ingress and egress onto the landlocked property of the Leases. Thus, without the right to use the easement for vehicular traffic, the Leases' land, for all practical purposes, would be rendered useless. See *Piper.* Cf. *Soltis v. Miller,* 444 Pa. 357, 282 A.2d 369 (1971). Most importantly, once the ground adjacent to the stream is covered with stones to a width reasonably sufficient for a motor vehicle to pass over, the easement will reasonably fulfill its specific purpose, namely, that the easement is to serve as an outlet from the Leases' land to the public road adjacent to the Dolls' property.

Accordingly, the order of the Superior Court and the decree of the Court of Common Pleas are reversed, and the record is remanded to the last mentioned court for the entry of a decree consistent with this opinion. Each side to pay its own costs.

these cases we stated that, if an easement is expressly granted and its precise location and limits are not fixed or defined by the grant, *the parties* may define the location and determine the limits of the easement by subsequent agreement, use, and acquiescence. In the two cited cases, the limits of the easement were established by reference to the actions of the original parties. See *Taylor v. Heffner,* supra (reference to actions of common owner's trustee); *Krauts' Appeal,* supra (reference to actions of common owner and original grantee). Instantly, the Superior Court heavily relied upon the actions of persons who held title to or resided on the two properties *after* the original parties and concluded the established width of the easement was a footpath. The only relevant fact relating to the original parties and considered by the Superior Court was that the "original grantee did not own an automobile." This fact, by itself, does not establish the width of the easement. Thus, the width of the easement is not specified in the grant nor is it determined by the actions of the parties.

Since the width of the easement is unspecified, our application of the rationale in *Piper* does not change the pre-established width of the easement. Furthermore, when, as in the instant case, the width is unspecified, the easement is of such width as is suitable and convenient for its reasonable use, including vehicular use. See footnote 5, supra.