**PARC HOLDINGS, INC. T/A PARC Development, L.P., A Pennsylvania Limited Partnership, Appellee,**

v.

**Paul J. KILLIAN and Bonita F. Killian, Husband and Wife, Appellants.**

Superior Court of Pennsylvania.

Argued March 14, 2001.

Filed Oct. 15, 2001.

Craig W. Jones, Pittsburgh, for appellants.

Paul R. Yagelski, Pittsburgh, for appellee.

Before: ORIE MELVIN, TODD, and KELLY, JJ.

ORIE MELVIN, J.

¶ 1 Appellants, Paul J. Killian and Bonita F. Killian, (the Killians), appeal from the final determination in this declaratory judgment action, which granted Appellee, PARC Holdings, Inc. t/a PARC Development, L.P. (PARC), the right to install utilities within the boundaries of an express easement. Specifically, the trial court ruled that the language of the easement or right of way was not limited to physical ingress and egress as alleged by the Killians but extended to the installment of utilities. For the reasons that follow, we affirm this ruling.

¶ 2 The facts and procedural history may be summarized as follows. PARC is the successor-in-interest to a tract of undeveloped land, consisting of approximately 46 acres, located in Indiana Township, Allegheny County, Pennsylvania. PARC purchased this land from Angela Glaros in 1998. Ms. Glaros acquired the property in 1990 from Crest Development Company (Crest). Prior to the sale to Ms. Glaros, in addition to this 46–acre tract Crest also owned a contiguous parcel consisting of 7.813 acres. Crest's original intention was to develop the 46 acres into residential lots. However, Crest did not consider the 7.813 acres suitable for development. In early 1985, Rudy Hofer, the President and sole shareholder of Crest, received a phone call from Mrs. Killian. Mrs. Killian indicated that she and her husband were interested in purchasing the 7.813 acres. The Killians own Lot No. 201, and their backyard is adjacent to the southeast corner of the 7.813–acre tract. However, the right of way in question does not abut lot 201; rather, it is adjacent to Lot 207, which is at the far northeast corner of the tract.[1]

---

1. To assist the reader in visualizing the layout of each party's property, we have attached to this Memorandum a diagram entered as PARC's Exhibit No. 2, which we hope will assist in this effort. The 7.813–acre tract is marked by an "X", the 46–acre tract is marked by a "Y" and the right of way is shaded and marked with a "Z."

¶ 3 During the negotiations for the sale, a survey was conducted that revealed the 7.813–acre tract separated the 46 acres from the paved road known as Chapel Crest Terrace. Consequently, once the 7.813–acre tract was conveyed, Crest's remaining 46 acres would become landlocked. To remedy this oversight the parties agreed to include in the deed a right-of-way over the land to be conveyed to provide access to the 46 acres. Crest's attorney first proposed the following language:

EXCEPTING AND RESERVING unto the Grantor, its successors and as-

signs, a right of way fifty (50) feet wide, **for any and all purposes connected with the use and occupation of other land now owned by the Grantor** adjoining the land hereby granted, the centerline of which shall be an extension of the center line of Chapel Crest Terrace, a fifty (50) foot street aforesaid, beginning at the most northerly extremity of Chapel Crest Terrace and extending in a northwesterly direction to other land now owned by the Grantor as aforesaid.

Certified Record, Exhibit 1 attached to Answer and New Matter, at 4 (emphasis added). The Killians' attorney modified to the language to read:

EXCEPTING AND RESERVING unto the Grantor, its successors and assigns a non-exclusive fifty (50) foot wide right-of-way, with Grantee, their heirs and assigns, **for ingress and egress to certain land now owned by Grantor** consisting of approximately 46 acres and adjoining the land hereby granted, the centerline of which Right–of–Way shall be an extension of the centerline of Chapel Crest Terrace, a fifty (50) foot street, and shall extend from the most northerly extremity of Chapel Crest Terrace, as currently existing, along the centerline of said Chapel Crest Terrace, as extended, in a northwesterly direction approximately thirty (30) feet to the southern border of the land now owned by Grantor and to be benefitted [sic] hereby.

Certified Record, Exhibit A attached to Complaint, at 1 (emphasis added). This revision was accepted and included in the deed closing the sale.

¶ 4 PARC subsequently purchased the 46 acres from Ms. Glaros and attempted to develop the land for residential homes. In order to accomplish its development PARC wanted to extend the utilities already in existence on Chapel Crest Terrace through the approximately thirty (30) foot long easement into the 46 acres. The utility lines on Chapel Crest Terrace continued past the current residences on Chapel Crest Terrace and abut the northerly end of the easement. The Killians objected to this use of the easement alleging the terms of the reservation limit its use to vehicular and foot traffic. Consequently, PARC filed the instant action seeking a declaration of the scope of the easement. PARC asserted the right of way was reserved for the purpose of providing access for future development of what would have been a landlocked parcel. Accordingly, PARC maintains the scope of the reservation is broad enough to include the provision of utilities, which are necessary for the profitable development of its land. The Killians answered by denying PARC's claim and asserting to the contrary that PARC's use of the right of way was specifically limited by the terms "ingress and egress" to merely pedestrian or vehicular access.

¶ 5 A two-day non-jury trial was held, and following the submission of written closing arguments the trial court issued an Opinion and Order finding in favor of PARC. Specifically, the trial court found PARC "has the right to install utilities over, under or through the subject easement" and "the Killians are prohibited from stopping or interfering with [PARC's] installation of utilities through the easement." Trial Court Opinion and Order, 3/14/00, Cert. Record at 14. The Killians timely filed a Motion for Post Trial Relief, seeking either the entry of judgment in their favor or the grant of a new trial. After considering the briefs filed by the parties and the arguments of their counsel, the trial court denied the Killians' motion and entered a final Order confirming its previous disposition. This timely appeal followed.

¶ 6 The sole issue presented for our consideration is whether the trial court abused its discretion or committed an error of law in interpreting the scope of the easement to include the installation of utilities.

¶ 7 Our scope and standard of review is well established. In *Fred E. Young, Inc. v. Brush Mountain*, 697 A.2d 984 (Pa.Super.1997), we noted:

When reviewing the decision of the trial court in a declaratory judgment action, our scope of review is narrow. *O'Brien v. Nationwide Mutual Insurance Co.*, 455 Pa.Super. 568, 689 A.2d 254, 257 (1997). Consequently, we are limited to determining whether the trial court's findings are supported by substantial evidence, whether an error of law was committed or whether the trial court abused its discretion, *Walker v. Ehlinger*, 544 Pa. 298, 300 n. 2, 676 A.2d 213, 214 n. 2 (1996).

The test is not whether we would have reached the same result on the evidence presented, but whether the trial court's conclusion can reasonably be drawn from the evidence. Where the trial court's factual determinations are adequately supported by the evidence we may not substitute our judgment for that of the trial court. *Clearfield Volunteer Fire Department v. BP Oil*, 412 Pa.Super. 29, 602 A.2d 877, 879 (1992), *appeal denied*, 531 Pa. 650, 613 A.2d 556 (1992) (citations omitted).

*Id.* at 987. Moreover, the

findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion.

When this court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected.

*Lane Enters. v. L.B. Foster Co.*, 700 A.2d 465, 470 (Pa.Super.1997) (citations omitted).

¶ 8 The Killians first argue that using the right of way for utilities is prohibited because the only use expressed is ingress and egress. They maintain the phrase "ingress and egress" is unambiguous and limits use of the easement to physical access. This argument begs the question by assuming the phrase has but one specific meaning. One could just as easily present the counter argument that if the parties truly intended to preclude the use of the right of way for utilities why didn't they so specify? All of the Killians' subsequent arguments stem from this flawed premise that the terms "ingress and egress" can only mean travel over land by foot or vehicle. The Killians do not direct our attention to any Pennsylvania authority for this proposition nor have we discovered any. Rather, they cite to *Allen v. Scheib*, 257 Pa. 6, 101 A. 102 (1917) and *Bell Atlantic Mobile Systems, Inc. v. Zoning Hearing Board*, 676 A.2d 1255 (Pa. Cmwlth.1996), for the general proposition that an easement cannot be used for a purpose unrelated to its original purpose. We find no fault with this rule of law; however, once again it assumes the original purpose was specified. We find *Allen* and *Bell* by their facts are clearly distinguishable [2]. Thus, they offer no guidance on the question of whether "ingress and

**2.** We further note, PARC relies on the case of *Dowgiel v. Reid*, 359 Pa. 448, 59 A.2d 115 (1948), which overruled *Allen* to the extent it is in conflict with the Supreme Court's decision in *Dowgiel*.

egress" limit the use of this easement to mere physical access.

¶ 9 The dispute in *Allen, supra,* arose when plaintiff hired a contractor to install a gas pipeline on the surface of a private road that ran through his property. The defendant, one of the landowners abutting the road, objected to the construction because it would obstruct his use of the private road as a means of access to the public road. The decision turned upon the determination of whether or not the private road was included in the grant of the fee or merely an easement. If included in the grant of the fee, Plaintiff could use his property as he saw fit. However, if only an easement, it cannot be used for "a purpose different from that for which it was dedicated." *Id.* 257 Pa. at 10, 101 A. at 103. The Supreme Court found the evidence failed to support ownership in fee and thus construction could be enjoined. Of significance was the fact the gas line was proposed to be constructed on the surface in which case it would clearly interfere with the road's continued use for access by the abutting landowners. Here, unlike in *Allen,* the proposed utilities would merely connect with those already in existence beneath and above Chapel Crest Terrace. Consequently, the use of the right of way to provide access to and from the 46 acres would continue without obstruction.

¶ 10 Similarly, the decision in *Bell Atlantic* did not turn on an interpretation of ingress and egress. Rather, the easement in question specifically granted access only for the purpose of constructing and maintaining a municipal water system. Bell Atlantic sought to use this easement to construct and operate a cellular telephone system. The Commonwealth Court found the purposed use was not within the scope of the original purpose of the grant, stating:

the original purpose of the grant of the right-of-way over the Milosers' property was for the purposes of constructing and operating a water system, and therefore, unlike the above cited cases, Bell Mobile's proposed use of the right of way, to construct and periodically service cellular phone communication equipment is not permitted. It is not merely an advance in the technology used to conduct or operate a water system, which is within the original purpose of the grant, and which fulfills the easement's purpose, but it is a different use, not related to the original purpose, and therefore outside the scope of the easement.

*Bell Atlantic,* 676 A.2d at 1270.

¶ 11 Consequently, we view the cases of *Allen* and *Bell Atlantic* as providing nothing more than examples of the application of the general rules of construction applicable to the grant of an easement. These rules provide that if the location, size or purpose of an easement is specified in the grant, then the use of an easement is limited to the specifications. *See Lease v. Doll,* 485 Pa. 615, 403 A.2d 558 (1979) and *Zettlemoyer v. Transcontinental Gas Pipeline Corp.,* 540 Pa. 337, 657 A.2d 920 (1995). If, however, the language of a granting deed is ambiguous regarding these matters, then the intent of the parties as to the original purpose of a grant is a controlling factor in determining the extent of an easement. *Zettlemoyer,* 657 A.2d at 926. Moreover, the intention of the parties "is determined by a fair interpretation and construction of the grant and may be shown by the words employed construed with reference to the attending circumstances known to the parties at the time the grant was made." *Lease,* 485 Pa. at 623, 403 A.2d at 561 (quoting *Merrill v. Manufacturers Light and Heat Co.,* 409 Pa. 68, 73, 185 A.2d 573, 575 (1962)).

¶ 12 Whether a trial court properly interpreted a contract is a question of law and our scope of review is plenary. *Liddle v. Scholze,* 768 A.2d 1183 (Pa.Super.2001). As with any contract the rights conferred by the grant of an express easement must be ascertained solely from the language of the deed, provided that the deed language is unambiguous. *Dowgiel v. Reid,* 359 Pa. 448, 59 A.2d 115 (1948); *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385 (1986). When the language is ambiguous, however, a court may resort to evidence of extrinsic circumstances as an aid to interpretation. *Id.* When the purposes of an express easement are not specifically stated, the court must ascertain the objectively manifested intention of the parties in light of the circumstances in existence at the time of conveyance. *Lease, supra.* Whether an ambiguity exists is a question of law subject to plenary review. *Juniata Valley Bank v. Martin Oil Co.,* 736 A.2d 650 (Pa.Super.1999). However, resolution of conflicting parol evidence relevant to what the parties intended by an ambiguous provision is for the trier of fact. *Hutchison, supra.*

¶ 13 The deed reserving the easement in the present case provided in pertinent part as follows: "a non-exclusive fifty (50) foot wide right-of-way, with Grantee, their heirs and assigns, for ingress and egress to certain land now owned by Grantor." We find the wording of the reservation as to its purpose ambiguous, as it generally defines its purpose in terms of providing mere access to the dominant estate by extension of a public road. The language does not specify a limited purpose to the access, such as "for the purpose of maintaining a water system" or "for pedestrian and vehicular travel only." Since we are dealing with the reservation of an easement or right of way in general terms without a specific statement of purpose,

case law clearly expresses that the focal point of inquiry is the intention of the parties who created the easement.

¶ 14 Instantly, the trial court considered the testimony of the Killians and their attorney and that of the Crest's owner and its attorney. The facts presented at trial by PARC reveal that Crest was at all times in the land development business and had even drafted preliminary plans for a subdivision of its 46 acres for residential purposes. Crest's attorney, Mr. Calkins, testified that he discussed with the Killians' attorney, Mr. Hartman, that the 46 acres was going to be used for development by Crest or sold for development. Additionally, both parties concede they only became aware the conveyance to the Killians would cause the 46 acres retained by Crest to become severed from the public road after a survey was performed. Prior to this revelation Crest was under the assumption that the southern boundary of its 46–acre tract was appurtenant to this public road. However, the survey revealed that Chapel Crest Terrace ended approximately 30 feet short of the 46 acres on its east side and 50 feet short on the west side.

¶ 15 Moreover, both Mr. Calkins and Mr. Hartman acknowledged the easement was created in order to extend the public road to the remaining Crest property. The intent to extend the public road is significant in that utilities are already installed along its length. Thus, the logical implication is that the parties also intended to extend the utilities along with the road. The Killians countered by testifying they only agreed to provide access to the 46 acres so that it could continue to be used by the public as recreational wilderness. They further asserted their intent to so limit the use is evidenced by their changing the wording of the easement from "for

any and all purposes" to "for ingress and egress." While Crest may have acquiesced in the trespass upon its land for purposes of recreation, such acquiescence does not necessarily translate into intent to forego future development should the opportunity arise. Likewise the changing of the wording does not as a matter of law remove the ambiguity as to the intended purpose. At best the evidence concerning the intentions of the parties was conflicting. Thus, the trial court was free to find PARC's evidence of intent to develop more credible. Moreover, the objectively manifested intent as shown by the existing circumstances also favors the interpretation that the purpose of the right of way was to extend the public road and thereby provide access for future development.

¶ 16 In this regard the trial court stated: Whatever way the language of the right-of-way reads, it appears to be simply an extension of Chapel Crest Terrace, a 50 foot street serviced by all common utilities—gas, electric, water, and cable. No person reading this language would interpret it to preclude the same utilities already installed and available in the same public street which was extended. Considering the circumstances then and there existing, an easement without the right to install utilities through this small 31 foot gap would be useless to the dominant estate from a commercial standpoint. The 46 acres had been on the market for sale for many years. Crest had an early incomplete plan of residential development drawn up consisting of over 30 proposed building lots, as well as a separate topographic map showing streets and elevations. If the Killians had broken silence and expressly notified Crest that utilities would be prohibited, Crest would never have completed the conveyance to the Killians. Common sense indicates that Crest would not forfeit the use of 46 acres of

valuable real estate to 'hiking, biking, and horseback riding' by the public as contended by the Killians.

Trial Court Opinion, 3/14/00, at 3–4. We agree with these astute observations of the trial court. More importantly, the trial court's conclusion that the parties intended to provide an easement or right of way for the purpose of extending the existing public road for future development purposes can reasonably be drawn from the evidence, and the evidence of record adequately supports its factual determinations. Under such circumstances we may not substitute our judgment for that of the trial court. *Clearfield, supra.*

¶ 17 Our Supreme Court's decision in *Dowgiel v. Reid,* 359 Pa. 448, 59 A.2d 115 (1948), illustrates that Pennsylvania has adopted the rule that where a right of way is granted or reserved without limit of use, it may be used for any purpose to which the land accommodated thereby may naturally and reasonably be devoted. In *Dowgiel,* the court was asked to determine whether "the right to use a road to and from one's habitation" also included the right to provide the property with electricity. *Id.* 59 A.2d at 117. In answering the question in the affirmative, the *Dowgiel* court reviewed the language and circumstances from various cases and concluded that "the weight of authority" favored a construction of easements to allow for utility access where the way was granted or reserved without any expressed limitation of its use. *Id.* at 118. In reference to one such case the court observed:

In *New York Central Railroad Co. v. Henry O. Yarian,* 219 Ind. 477, 39 N.E.2d 604, 605, 139 ALR 455, it was held that the right to the maintenance of a farm crossing by a railroad, the right of way of which divides a farm and cuts off the buildings thereon from access to

the highway, under a provision in the deed to the railroad requiring it 'to permit & maintain two farm crossings,' *includes the right to install a conduit underneath the right of way to carry electricity from an electric line on the highway to the buildings* to be used for farm and domestic purposes, provided that such conduit is constructed in such a way as not to make it dangerous to operate the railroad over the crossing. The Supreme Court of Indiana stated:

> The reservation was for a 'farm crossing', and it must be concluded that it was intended to afford a means of access to the divided portions of the farm and to the adjacent and only available highway. It is true that at the time the deed was made the crossing was only used as a pedestrian crossing or for animals or animal-drawn vehicles, but there is no express limitation of the use to such traffic. It is sometimes said that reservations of easements are strictly limited to the purposes in the minds of the parties, but we believe a proper application of the rule puts the limitation not upon the character of traffic upon a reserved way, but *upon the purpose to be served by the traffic.* Without the reservation, public policy would have implied an intention that the dominant estate should have a way of passage over the servient estate *because such a way is necessary to the full and fair enjoyment of the dominant estate,* and it is against public policy that estates be cut off from use and profitable enjoyment.... In Jones on Easements, § 323, p. 263, it is said: 'The extent of a way of necessity is a way such as is required for the complete and beneficial use of the land to which such way is impliedly attached.' ... it has sometimes been said that the right is limited to such a

way as was necessary at the time. But we think the limitation is upon the use of the dominant estate served, in this instance a farm home, and that *the way may be used in any manner that is reasonably required for the complete and beneficial use of the dominant estate as a farm or home.*

*Dowgiel,* 359 Pa. at 455, 59 A.2d at 118.

¶ 18 Here, we are presented with a similar reservation under similar circumstances. Notably, the reservation was expressed in general terms and the evidence supports the conclusion that the presumed intention was to afford a means of access to the retained 46 acres by extending the public road for the purpose of future development. Moreover, as further noted in *Yarian,* assuming the sale to Killians would have landlocked the 46 acres, the doctrine of easement by necessity would have dictated the same result even without the reservation in the deed. Under this doctrine, a right of way over the servient estate would have been implied to prevent the retained land of the dominant estate from being denied access to the public road, and thereby denying it the full beneficial use as development property. *See Phillippi v. Knotter,* 748 A.2d 757, 760 (Pa.Super.2000) (holding law imposes right-of-way by necessity across portion of tract which when severed from another portion cuts off access to back tract); *Tricker v. Pa. Turnpike Commission,* 717 A.2d 1078, 1082 (Pa.Cmwlth.1998) (same). Such an easement is created as a result of a strong public policy that no land may be made inaccessible or useless.

¶ 19 A broad reading of the easement and the trial court's conclusion that installation of utilities falls within its scope is further supported by the Restatement Third, Property: Servitudes § 4.10, comment d, which provides:

The first step in determining whether the holder of an easement is entitled to make a particular use challenged by the owner of the servient estate is to determine whether the use falls within the purposes for which the servitude was created. The process is described in Comment h to § 4.1. The determination is primarily one of fact, based on inferences that may be drawn from the language and circumstances, but the outcome in any particular case may be affected by the level of generality with which the purpose is defined. For example, the purpose of an easement for 'ingress and egress' may be specifically defined as the entrance and exit of people, or people and vehicles, or more generally defined as access to the dominant estate. Using the more specific definition would justify the conclusion that the easement could not be used for utilities; using the more general definition would lead to the opposite result.

¶ 20 In this regard, the Restatement provides the following illustration in the context of an expressed easement and one implied by necessity:

4. O, the owner of Blackacre, granted an easement to Able, the owner of Whiteacre, for 'ingress and egress' from Whiteacre to the public street abutting Blackacre. The deed did not specify whether utility lines could be placed in the easement. Unless the facts or circumstances suggest that the parties intended otherwise, it would be proper to define the purpose of the easement generally to include access for anything that could conveniently be transported through the easement corridor and that would normally be used in connection with property situated like Whiteacre, including utility services.

6. O, the owner of Blackacre and Whiteacre, conveyed Whiteacre to Able by a conveyance that landlocked Whiteacre, giving rise to an easement by necessity. In identifying the purpose of the easement, it would be proper to define necessity generally to include everything necessary for normal use of the dominant estate for the purposes for which it is suited, rather than specifically to include only access for people and goods by standard means of surface transport. Able would be entitled to place utility lines in the easement.

*Id.*

¶ 21 In addition to *Dowgiel,* these principles find further support from decisions in other jurisdictions. *See Atkinson v. Mentzel,* 211 Wis.2d 628, 566 N.W.2d 158, 163 (1997) (stating "[a]lthough at the time of the conveyance creating the easement the property was not served by utilities, the reasonable use of the property in current times requires utility services."); *Cline v. Richardson,* 526 N.W.2d 166 (Iowa App. 1994) (finding easement included right to install utilities); *Morrell v. Rice,* 622 A.2d 1156, 1158 (Me.1993) (holding an easement of necessity was established and included right to install underground utilities); *Ware v. Public Ser. Co. of New Hampshire,* 412 A.2d 84, 86 (Me.1980) (holding right to use road includes right to erect poles for electricity); *Kelly v. Schmelz,* 439 S.W.2d 211, 213 (Mo.Ct.App.1969) (same); *Fleming v. Napili Kai, Ltd.,* 50 Haw. 66, 430 P.2d 316, 319 (1967) (stating "[i]t is the usual and common practice in this State to use roadway easements as rights of way for electricity, telephone, water and drainage facilities. . . ."), *reh'g denied,* 50 Haw. 83, 431 P.2d 299 (1967). The fact some of the above cited cases deal with implied rather than express easements does not affect our decision. The same rationale is equally applicable in determining the scope of an easement granted by deed in general

terms, or an easement implied by necessity. *Dowgiel, supra.*

¶ 22 In summation, a review of the language in the Crest–to–Killians deed demonstrates an easement by reservation was stated in general terms. Thus, resort to extrinsic evidence of the parties' intent was appropriate. The extrinsic evidence established the owner of the dominant estate was clearly in the land development business and testified he intended to hold the land for future development. Therefore, the trial court's finding that the attendant circumstances weighed in favor of PARC's contention that the purpose of the reservation was for development is supported by competent evidence. Given this competent evidence of objectively manifested intention, the trial court could reasonably conclude the right-of-way was unrestricted and included the right to install utilities. Accordingly, our review of the record indicates that the trial court's conclusion is supported by competent evidence and is proper based upon the applicable principles of law.

¶ 23 Judgment affirmed.

¶ 24 TODD, J. files a Concurring Opinion.

TODD, J., Concurring.

¶ 1 While I agree that the trial court's decision should be affirmed, I would do so on a more narrow basis. Accordingly, I concur in the result reached by the Majority.

¶ 2 I disagree with the Majority's characterization of the easement at issue here as a right of way in "general terms" (Op. at 112, 114) or impliedly as one "without any expressed limitation of its use." (Op. at 113.) I do not find the phrase "ingress and egress" to be unlimited. Such a characterization strips these words of any meaning and, specifically in this case, ig-

nores the drafting changes made by the parties. For this reason, I find to be inapplicable many of the cases relied on by the Majority in support of its contention that utility access is the favored interpretation of the phrase "ingress and egress". For example, in *Dowgiel v. Reid,* 359 Pa. 448, 59 A.2d 115 (1948), the sole Pennsylvania case cited by the Majority on this issue, the easements provided for "right and privilege of a private road ... for the use" or "for the benefit" of the grantees, language which I find is broader than that presented here. *Id.* at 450, 59 A.2d at 116. *See also Atkinson v. Mentzel,* 211 Wis.2d 628, 566 N.W.2d 158, 161 (1997) (easement provides for "access for all uses ... other than retail sales"); *Ware v. Public Serv. Co. of New Hampshire,* 412 A.2d 84, 85 (Me.1980) (easement grants "right to use, for all purposes"); *Kelly v. Schmelz,* 439 S.W.2d 211, 212 (Mo.Ct.App.1969) (grants "an easement 18 feet wide"); *Fleming v. Napili Kai, Ltd.,* 50 Haw. 66, 430 P.2d 316, 317 (1967) (partition decree provides roads are "for the use of everyone having any interest in the said lands"). Further, for a resolution of this matter I do not believe our analysis needs to extend beyond an assessment of the intention of the parties.

¶ 3 In that regard, I agree with the Majority that the phrase "ingress and egress" is ambiguous because, given the circumstances in which this easement was drafted, that phrase reasonably could be interpreted to include only pedestrian or vehicle access, or more broadly to include the placement of utilities. *See Baney v. Eoute,* 784 A.2d 132, 2001 WL 1002817, at *2 (Pa.Super.Sept.4, 2001) (term in easement is ambiguous if "susceptible of more than one reasonable interpretation"); *Madison Constr. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 606, 735 A.2d 100, 106 (1999) ("contractual terms are ambiguous if they are subject to more than one

reasonable interpretation when applied to a particular set of facts."). I find the Restatement (Third) of Property § 4.10, which the Majority cites, to be particularly persuasive on this point, as this section notes the varying definitions which may be ascribed to the phrase "ingress and egress," including access for utilities. Given that the phrase is ambiguous, I conclude the trial court properly considered extrinsic evidence of the intention of the parties regarding its meaning, and agree with the Majority that the trial court's conclusion that utility access as encompassed by the easement was supported by the evidence. On that basis, I would affirm its decision.