J-S79039-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| KIMBERLY L. VALENTINE, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MELISSA M. WETZEL | : | No. 790 MDA 2018 |

Appeal from the Order Entered April 12, 2018
in the Court of Common Pleas of Adams County
Civil Division at No(s): 2017-SU-0001093

BEFORE: SHOGAN, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: **FILED MARCH 12, 2019**

Kimberly L. Valentine ("Valentine") appeals from the Order declaring that the common law marriage, which she alleged to have taken place with Melissa M. Wetzel ("Wetzel"), is invalid.[1]  We affirm.

In its Opinion, the trial court set forth the relevant factual history and evidence underlying the instant appeal, which we adopt as though fully restated herein.  *See* Trial Court Opinion, 4/12/18, at 2-7.

On October 4, 2017, Valentine filed a Complaint pursuant to sections 3301(c) and (d) of the Divorce Code, as well as economic claims.  Specifically, Valentine claimed that the parties had entered into a common law marriage

_____

[1] Rule 341 provides that an appeal may be taken as of right from any final order of a lower court.  Pa.R.A.P. 341(a).  In relevant part, a final order is any order that disposes of all claims of all parties.  Pa.R.A.P. 341(a)(1).  The trial court's Order disposed of all claims of all parties, and accordingly, is final and appealable.

on December 25, 2003, in Frederick County, Maryland. Wetzel filed Preliminary Objections to the Complaint, claiming that in 2003, Maryland had not yet recognized same-sex marriage. On December 4, 2017, Valentine filed an Amended Complaint, which additionally averred that the parties had entered into a common law marriage in Adams County, Pennsylvania, on December 25, 2004. Valentine asked that the trial court declare their marriage valid.[2] Wetzel filed Preliminary Objections to the Amended Complaint. After an evidentiary hearing, the trial court entered its April 12, 2018 Order declaring that Valentine had failed to establish, by clear and convincing evidence, a valid common law marriage. **See** Trial Court Order, 4/12/18. Thereafter, Valentine filed the instant timely appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Valentine presents the following claims for our review:

1. Whether the [t]rial [c]ourt abused its discretion and/or made an error of law when it concluded, against the weight of the evidence, that no common law marriage existed[?]

2. Whether the [t]rial [c]ourt abused its discretion and/or made an error of law when it concluded, against the weight of the evidence, that the evidence did not establish that the parties intended to enter into a marriage contract[?]

Brief for Appellant at 4.

---

[2] **See** 23 Pa.C.S.A. § 3306 (allowing a party or parties to the marriage to file a declaratory judgment action seeking a declaration that the marriage is valid or invalid).

- 2 -

Valentine first claims that the clear and convincing evidence established that she and Wetzel had entered into a common law marriage contract, "and that they intended to, and indeed did, live as a married couple for approximately 13 years." *Id.* at 12. Valentine acknowledges that the trial court "point[ed] to contradictory accounts of the parties' witnesses in holding that the parties had failed to "utter present tense words sufficient to establish a marital contract." *Id.* Valentine argues, however, that this is not fatal to her claim of a common law marriage. *Id.* According to Valentine, she put forth evidence that she had presented Wetzel with a ring and had asked Wetzel to "be mine"; the parties purchased a home and moved to Adams County; the home was to be for their blended family; they purchased rings in 2004; and on December 25, 2004, they exchanged the rings and reaffirmed their intention to live as a married couple. *Id.* at 13-14.

Valentine further argues that it was unreasonable for the trial court not to consider corroborating evidence of their common law marriage. *Id.* at 15. Valentine directs our attention to evidence that she and Wetzel cohabitated continuously from November 2004 until May 2017; they had a joint insurance policy for the home; they comingled their money and had joint bank accounts; they started a business together; they celebrated their anniversary every year and exchanged anniversary cards; they were jointly named on bills; Wetzel named Valentine a beneficiary on her accounts; and each had executed a will designating the other as beneficiary and power-of-attorney. *Id.* at 15-16. In

addition, Valentine claims that she publicly introduced Wetzel as her "wife," and the two attended social events as a married couple. *Id.* at 17. Finally, Valentine directs our attention to evidence that her daughter considered Wetzel to be a step-parent; Wetzel was listed on the school emergency contact card; and Wetzel attended school functions as a parent. *Id.*

As this Court has explained,

> [w]hen reviewing the decision of the trial court in a declaratory judgment action, our scope of review is narrow. ***O'Brien v. Nationwide Mutual Insurance Co.***, 455 Pa. Super. 568, 689 A.2d 254, 257 (1997). Consequently, we are limited to determining whether the trial court's findings are supported by substantial evidence, whether an error of law was committed or whether the trial court abused its discretion, ***Walker v. Ehlinger***, 544 Pa. 298, 300 n.[]2, 676 A.2d 213, 214 n.[]2 (1996).
>
> The test is not whether we would have reached the same result on the evidence presented, but whether the trial court's conclusion can reasonably be drawn from the evidence. Where the trial court's factual determinations are adequately supported by the evidence we may not substitute our judgment for that of the trial court. ***Clearfield Volunteer Fire Department v. BP Oil***, 412 Pa. Super. 29, 602 A.2d 877, 879 (1992), ***appeal denied***, 531 Pa. 650, 613 A.2d 556 (1992) (citations omitted).

***PARC Holdings, Inc. v. Killian***, 785 A.2d 106, 110 (Pa. Super. 2001) (quoting ***Fred E. Young, Inc. v. Brush Mt. Sportsmen's Ass'n***, 697 A.2d 984, 987 (Pa. Super. 1997). Moreover, the

> findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion. When this [C]ourt reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and

proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected.

***PARC Holdings, Inc.***, 785 A.2d at 110 (citation omitted).

In its Opinion, the trial court set forth the applicable law, addressed Valentine's claim, and concluded that it lacks merit. ***See*** Trial Court Opinion, 4/12/18, at 7-12. We agree with and adopt the sound reasoning of the trial court, and affirm on this basis with regard to Valentine's claim. ***See id.***

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/12/2019

**IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA**
**CIVIL**

K.L.V.,                                                    2017-S-1093
      **Plaintiff**

      **v.**

M.M.W.,
      **Defendants**

## OPINION

K.L.V. (hereinafter "Kimberly") seeks a declaratory judgment from this Court to establish that she and M.M.W (hereinafter "Melissa") established a valid common law marriage on December 25, 2004, which will then allow Kimberly to proceed with her Amended Complaint in Divorce. For the reasons stated below, Kimberly has failed to establish, by clear and convincing evidence, that the parties entered into a common law marriage on December 25, 2004.

## PROCEDURAL HISTORY

Kimberly filed a Complaint under Sections 3301(c) and (d) of the Pennsylvania Divorce Code on October 4, 2017, along with related economic claims. The parties are the same gender. In her Complaint, Kimberly verified under penalty of unsworn falsification that the parties entered into a common law marriage on December 25, 2003 in Frederick County, Maryland. Melissa filed a timely Preliminary Objection to Kimberly's Complaint, alleging a lack of subject matter jurisdiction, because Maryland did not recognize same-sex marriage in 2003. No Answer was filed. Without leave of Court, Kimberly subsequently filed an "Amended Complaint In

1

Divorce Seeking Declaratory Judgment of Common Law Marriage" on December 4, 2017[1]. In her Amended Complaint, Kimberly averred alternatively that the parties entered into a common law marriage on December 25, 2004 in Adams County, Pennsylvania, and requested this Court to declare their marriage valid, pursuant to 23 Pa. C.S.A. §3306[2]. Melissa filed a Preliminary Objection to Kimberly's Amended Complaint on January 3, 2018, again alleging lack of subject matter jurisdiction. Specifically, Melissa argues that Kimberly's Amended Complaint should be dismissed because no marriage license has been produced and because Pennsylvania did not recognize same-sex marriage in any format, including in the context of common law marriage, until 2014. Briefs were timely filed. Kimberly stated in her brief that she "may concede that Maryland does not recognize common-law marriage", which would render her initial divorce complaint moot. This Court held an evidentiary hearing on January 19, 2018.

## FACTUAL BACKGROUND

Kimberly and Melissa greatly dispute the extent of their relationship and the events that transpired during their time as a couple. They commenced a romantic dating relationship on or about August 15, 2003. They lived together as same-sex domestic partners in Adams County from sometime in late 2003/early 2004 until they separated in May of 2017. They did not obtain a marriage license in any state after same-sex marriage became legally recognized.[3]

During the evidentiary hearing Kimberly testified that, on Christmas Day 2003 in Maryland, she gave Melissa "a sapphire and diamond ring and asked her to be mine". The

---

[1] See Pa. R.C.P. No. 1033.

[2] **§ 3306. Proceedings to determine marital status.** When the validity of a marriage is denied or doubted, either or both of the parties to the marriage may bring an action for a declaratory judgment seeking a declaration of the validity or invalidity of the marriage and, upon proof of the validity or invalidity of the marriage, the marriage shall be declared valid or invalid by decree of the court and, unless reversed upon appeal, the declaration shall be conclusive upon all persons concerned. *23 Pa. C.S.A. §3306.*

[3] The U.S. District Court's landmark decision in ***Whitewood v. Wolf*** effectively legalized same-sex marriage in Pennsylvania in 2014. *Id.*, 992 F.Supp.2d 410 (M.D. Pa. 2014).

parties were residing in separate residences in Maryland at that time. Kimberly testified that the parties acquired real estate in Adams County in November of 2004, moved in together, and decided to enter into a common law marriage on December 25, 2004 in their new home. Kimberly's testimony is consistent with her amended complaint but contradicts her averment in her original divorce complaint, wherein she verified under penalty of unsworn falsification that the parties established a common law marriage exactly one year prior to that in Maryland. Kimberly attempted to reconcile her various versions of events by testifying that she and Melissa were engaged to be married on Christmas Day 2003 and then "re-exchanged" rings on Christmas Day 2004. Melissa agrees that Kimberly gave her the sapphire and diamond ring in December of 2003, but maintains that it was a Christmas gift, not part of a marriage proposal. There were no other witnesses to verify the circumstances surrounding the gift of the ring on Christmas Day 2003 in Maryland.

Kimberly testified that Melissa purchased wedding bands for them both in contemplation of marriage, and on Christmas Day 2004, these bands were exchanged and vows were promised between them. Kimberly wore a band style ring during the hearing, but acknowledged that it was not the band that Melissa gave her in 2004. When asked to identify the specific verbiage of the vows, Kimberly testified "just something about love and cherish and we pretty much just put the rings on each other's finger." There were no witnesses to this alleged exchange, not even Kimberly's daughter, T.C., who resided with the couple at the time. The event was not memorialized by photographs or recordings. Kimberly testified, "Well, I have never been married, but I felt like we lived as a married couple" after that occasion.

In further support of her position, Kimberly presented testimony from a friend who met the couple in 2008. She stated that Kimberly introduced Melissa to her as her wife and Melissa

3

did not object to that appellation. The witness and her husband socialized with the couple, who wore what appeared to be wedding rings, and spoke of co-parenting Kimberly's daughter.

Melissa's perspective is diametrically opposed to Kimberly's. She testified that there was never an exchange of wedding bands or vows, and that Christmas Day 2004 was not a date of significance to her. Having recently been through a difficult divorce from her husband, she did not intend to be bound by the bonds of matrimony again. She testified that the parties bought rings for themselves, but not in anticipation of entering into a marriage contract. A photograph of the couple on a cruise in 2012 shows Melissa wearing rings on the ring finger of her left hand. Kimberly's hands are obscured. *Plaintiff's Exhibit 3.* Kimberly's daughter, T.C., who lived with the parties for the majority of their relationship, and viewed Melissa as her stepmother, testified that her mother gave jewelry as a gift to Melissa every Christmas. T.C. corroborated Melissa's testimony that that the parties celebrated their anniversary in August, which is the month they began dating, not on the alleged wedding date in December. This is further corroborated by a screenshot of Melissa's facebook page introduced into evidence by Kimberly. *Plaintiff's Exhibit 1.* Melissa's relationship status is designated as "in a domestic partnership with [Kimberly] since August 15, 2003". The undated anniversary greeting cards introduced by Kimberly evidence a loving and committed relationship between the two parties, but do not denote a specific anniversary date to support Kimberly's position as to the date of marriage or that the parties considered themselves married to one another. Kimberly also presented a copy of Melissa's father's obituary, dated 2011, which acknowledges Kimberly by name as Melissa's "partner"[4]. *Plaintiff's Exhibit 16.* Kimberly testified that she introduced Melissa to people "mostly as my

---

[4] As indicated in testimony, prior to the legalization of same-sex marriage, it was not uncommon for same-sex couples in committed relationships to refer to one another as a "partner", "friend", "domestic partner", etc. The use of these monikers, in and of itself, does not automatically discount the potential for the existence of a common law marriage.

4

partner". In his durable health care power of attorney dated January 2, 2014, Kimberly's father identified Melissa as his "daughter-in-law" and gave her decision making authority. *Plaintiff's Exhibit 15.* Melissa presented testimony from her mother and her employee, who testified that the women were not married and did not have a reputation in the local community as being married.

The parties also dispute when they began cohabitating and the nature of their living arrangement as it existed throughout the course of their relationship, particularly surrounding the December 25, 2004 alleged date of marriage. By deed dated November 29, 2004, Melissa took title as a single woman to property located on Bullfrog Road in Adams County. *Defendant's Exhibit 2.* The homeowner's insurance policy issued December 7, 2004 lists both parties as policy holders on page 1, both with a Maryland mailing address, but Melissa is listed as the sole policy holder on page 3. *Plaintiff's Exhibit 11.* Kimberly testified she and Melissa moved into that residence together in November 2004, along with T.C. and Kimberly's father. Kimberly produced a photograph from Melissa's scrapbook with a caption purportedly indicating that they all moved in together as a single family unit. *Plaintiff's Exhibit 2.*

In contrast, Melissa testified she intended to remain living in Thurmont for a time after the purchase of the property. Melissa produced copies of lease agreements to demonstrate that she purchased the Bullfrog Road property with the intention to rent it to Kimberly and her father, to assist them as they were being imminently displaced from their previous home. Kimberly testified that Melissa requested these leases be signed so that Melissa could gain financial leverage to obtain additional real estate, which Melissa denies. The lease agreements, signed on November 30, 2004, designate Melissa as landlord and Kimberly and her father as tenants. Interestingly, the preambles of the 2004 lease agreements state that Melissa was "of Fairfield",

5

not Thurmont, in contradiction to Melissa's testimony. Furthermore, these leases were renewed by the parties on November 30, 2005, after Melissa testified that she already begun residing at that property. *Defendant's Exhibit 18.*

Also corroborating Kimberly's testimony, the parties jointly made written application to Adams Electric Cooperative for electrical service to the property, designating on the form that the property is "one hundred percent personal residence use (YOUR PRIMARY RESIDENCE)", instead of checking "rental property" in section 3 of the form. Melissa and Kimberly signed this form on December 3, 2004. Melissa paid the requisite application fee. *Plaintiff's Exhibit 13.* Examining all of the evidence related to cohabitation arrangement of the parties, however conflicting, it appears that Melissa purchased the property with the intent to reside there with Kimberly, while using the appearance of lease income to bolster her financial position.

To further demonstrate the living arrangement and the nature of the parties' relationship, Kimberly introduced an agreement dated March 22, 2005 in which Melissa gave Kimberly 50% ownership interest in the equity of the Bullfrog Road home. *Plaintiff's Exhibit 18.* Kimberly asserted that this agreement was not executed concurrently with the purchase of the home because Kimberly's negative credit issues prevented her from being a mortgagor and having her named placed on the deed. Notwithstanding that, she insisted that it was the implicit understanding of the parties that Kimberly was an equal owner of the property at the time it was purchased. To date, Kimberly's name has never been added to the deed. The existence of this agreement shows an intent to commingle an asset and a certain level of commitment between the parties, but is not conclusive proof that the parties were married.

The parties had a joint bank account and some joint bills during the course of their relationship. They jointly acquired a vehicle in April of 2005. Kimberly asserts that this conduct

6

is consistent with that of a married couple. Melissa avers that this is consistent with committed partners residing together, but is not evidence of a marriage contract. To support her argument, Melissa produced bills and accounts that list the parties' marital status as "single" after the alleged date of marriage, including an auto insurance policy issued on September 24, 2007. *Defendant's Exhibit 4.* Melissa produced her 2010 United States Census questionnaire, wherein she referred to Kimberly as a household member and marked the "unwed partner" box instead of the "husband or wife" box. She further designated Plaintiff's Father as a household member and marked the "Other nonrelative" box instead of "Parent-in-law" box. *Defendant's Exhibit 5.* Melissa introduced a 2010 article from the local community newspaper, drafted by her aunt, which refers to Kimberly as a "friend" of Melissa. *Defendant's Exhibit 6.* Melissa is very close with her aunt, thus her aunt would have known her marital status. This newspaper article is also indicative of how the parties held themselves out to the local community. Melissa, a certified public accountant, prepared both parties' tax returns throughout the course of their relationship. She produced Kimberly's tax returns, including those filed in 2015 and 2016, which designate Kimberly as "head of household" claiming her daughter and her father as dependents, but not claiming a spouse. *Defendant's Exhibits 9, 10.* Melissa produced several more documents dated in 2011, wherein she indicated she was single and that Kimberly was her "non-spouse" and "friend", to further demonstrate that she represented herself as a single woman and that Kimberly was merely a romantic partner and a friend.

## APPLICABLE LAW

Two types of marriage exist in Pennsylvania, ceremonial and common law. ***Staudenmayer v. Staudenmayer***, 552 Pa. 253, 714 A.2d 1016 (1998). Ceremonial marriage is a wedding or marriage performed by a religious or civil authority with the usual or customary

7

ceremony or formalities. *Id.*, see also *23 Pa.C.S.A. § 1501 et seq.* Common law marriages entered into after January 1, 2005 have been declared invalid by statute, but this abolishment was not made retroactive. *23 Pa. C.S.A. §1103.*[5] Thus, it remains possible for a valid common law marriage to have been established on or before January 1, 2005. The case of *In re Estate of Carter* extended the right to establish common law marriage to same-sex couples. In doing so, our Superior Court explained, "because opposite-sex couples in Pennsylvania are permitted to establish, through a declaratory judgment action, the existence of a common law marriage prior to January 1, 2005,…same-sex couples must have that same right." *In re Estate of Carter,* 159 A.3d 970, 977–78 (Pa. Super. 2017). To deprive one party the opportunity to establish rights as the other party's common law spouse, simply because they are a same-sex couple, "would violate both the Equal Protection and Due Process Clauses of the Fourteenth Amendment." *Id.*

When the validity of a marriage is denied, a party to the alleged marriage "may bring an action for declaratory judgment seeking a declaration of the validity or invalidity of the marriage, and upon proof of the validity or invalidity of the marriage, the marriage shall be declared valid by decree of the court and…the declaration shall be conclusive upon all persons concerned." *23 Pa. C.S.A. §3306.* The burden to prove a common law marriage is on the party alleging the marriage. *PPL v. Workers' Compensation Appeal Bd.*, 5 A.3d 839 (Pa. Cmwlth. 2010).

Typically, *verba in praesenti* (words in the present tense) spoken between putative spouses are required for a valid common law marriage. It is the present intent of parties to the

---

[5] "The Act of November 24, 2004, P.L. 954 (Act 144), amended Section 1103 of the Marriage Law to provide as follows: 'No common-law marriage contracted after January 1, 2005, shall be valid. Nothing in this part shall be deemed or taken to render any common-law marriage otherwise lawful and contracted on or before January 1, 2005, invalid.' *23 Pa.C.S. § 1103*. In light of the Legislature's action, this Court has determined that any common law marriage contract entered into prior to January 1, 2005 remained valid… ." *PPL v. Workers' Compensation Appeals Bd.*, 5 A.3d 839, 843–44 (Pa. Cmwlth. 2010)(citations omitted)

8

marriage contract which is crucial and not form of words used. ***David v. Bellevue Locust Garage***, 12 Pa.Cmwlth. 602, 607, 317 A.2d 341, 343 (1974). In cases when one party is unavailable to testify regarding the *verba in praesenti*, there is a rebuttable presumption in favor of common law marriage when the burdened party proves constant cohabitation and a reputation of marriage. ***PPL v. Workers' Compen. App. Bd.***, *supra; s*ee also, ***In re Estate of Carter***, 159 A.3d 970, 979 (Pa. Super. 2017). However, the reliance on such a presumption based upon proof of cohabitation and reputation is only proper where direct evidence of the alleged marriage agreement is unavailable. ***Id.*** Where both putative spouses are available to testify, as in the instant case, this presumption does not apply.

"Common-law marriage claims are reviewed with great scrutiny." ***Elk Mountain Ski Resort, Inc. v. Workers' Compensation Appeals Bd.***, 114 A.3d 27 (Pa. Cmwlth. 2015). The exchange of *verba in praesenti*, spoken with the specific purpose of creating the legal relationship of marriage "is a heavy burden and must be established by clear and convincing evidence" of the exchange of words creating the marriage contract. ***Id***. The clear and convincing evidence standard is the highest standard of proof utilized in civil proceedings, requiring "evidence that is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts [in] issue." ***In re Vencil***, 638 Pa. 1, 152 A.3d 235, footnote 1 (Pa. 2017), *citations omitted*. "When faced with contradictory testimony regarding *verba in praesenti*, the party claiming a common law marriage may introduce evidence of constant cohabitation and reputation of marriage in support of his or her claim." ***Studenmayer***, 714 A.2d at 1021.

## DISCUSSION

Melissa argues that it is impossible for a same-sex common law marriage to have been formed between the parties because common-law marriage was abolished after January 1, 2005

9

and same-sex marriage was not legalized in Pennsylvania until 2014. As *In Re Estate of Carter* recognizes the ability for same gender couples to establish a valid common law marriage on or before January 1, 2005, this argument fails. This case actually turns upon whether or not Kimberly has met her heavy burden through the presentation of clear and convincing evidence that the couple exchanged *verba in praesenti* on December 25, 2004, thereby evidencing their intent to form a marriage contract at that moment.

Kimberly's testimony concerning *verba in praesenti* exchanged between the parties was "just something about love and cherish and we pretty much just put the rings on each other's finger". *Tr. At 15.* Melissa denies that this occurred at any time during the parties' relationship. There are no witnesses, nor any documentation to corroborate Kimberly's version of events. Melissa's testimony regarding the couple celebrating their anniversary in August, not December, was corroborated by T.C. Further undermining Kimberly's credibility are her two divorce complaints, both signed under penalty of unsworn falsification, wherein she cites two different marriage dates in two different locations, compounded by her testimony that the 2003 alleged wedding date was actually the day that she proposed marriage to Melissa, then stating that they "re-exchanged rings" on the second alleged wedding date in 2004.

In an effort to overcome the conflicting testimony regarding the existence of *verba in praesenti*, Kimberly presented credible evidence of constant cohabitation by the parties from late 2003/early 2004 until 2017. See **Staudenmayer**, *supra*. However, "cohabitation between unmarried people today does not carry with it the same social taboo as when the common law marriage doctrine was developed", and is perhaps less indicative of parties to be married spouses "than it was fifty or one hundred years ago." *Id.,* 714 A.2d at 1023. "Since people live together

without intending to marry there must be proof of an agreement to enter into the relationship in order to establish that the parties are married." *Hertz v. Hertz*, 23 Pa. D. & C.3d 55 (1981).

The parties presented conflicting evidence regarding whether they had a reputation for marriage that was broad and general. Some people thought they were married. Melissa's family members believed they were not married. Melissa's father's obituary referred to Kimberly as Melissa's "partner" and an article written by Melissa's aunt referred to Kimberly as Melissa's "friend". In contrast, Kimberly's father referred to Melissa as his daughter-in-law. Pertinent to determination of whether a marriage exists is how the parties themselves view the relationship. *Id.* Melissa provided a number of documents to demonstrate her intention to remain an unmarried person throughout the course of the relationship.

Kimberly's evidence falls short of meeting the heavy burden of being clear and convincing. Melissa's testimony regarding lack of the exchange of *verba in praesenti* is more credible than Kimberly's vague, uncorroborated assertion. The two accounts directly contradict one another. T.C.'s testimony corroborates Melissa's version of the relationship, particularly with respect to the date they celebrated their relationship. There is not clear and convincing evidence that *verba in praesenti* were exchanged. The evidence regarding constant cohabitation of the parties and their reputation in the community also falls short of substantiating Kimberly's claim.

It is clear that Kimberly and Melissa once loved and cared for one another. They forged a loving, committed domestic partnership and close friendship for approximately 13 years. They lived under the same roof, slept together, commingled assets and liabilities, and started a landscaping business together. They exchanged gifts and greeting cards to recognize important and romantic occasions. They socialized with other couples. They took care of each other.

11

While these behaviors are undertaken by married couples, they are also undertaken by many unmarried couples. None of these circumstances, in whole or in part, demonstrate an intent by the parties to enter into a marriage contract on December 25, 2004.

## **CONCLUSION**

Kimberly has failed to establish, by clear and convincing evidence, that she and Melissa entered into a common law marriage on December 25, 2004. Therefore, Melissa's Preliminary Objections to the Complaint and Amended Complaint are sustained for the reasons stated herein. A valid common law marriage has not been established. An Order and Decree shall be entered accordingly.

BY THE COURT,

Date: April 12, 2018

**Christina M. Simpson, Judge**

12