J-A12017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| PRINTFLY CORPORATION | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JORDAN NEMEROFF AND ELYSSA | : | |
| NEMEROFF | : | |
| | : | No. 1759 EDA 2022 |
| Appellants | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL NEMEROFF AND ALEXIS | : | |
| NEMEROFF | : | |

Appeal from the Order Entered June 9, 2022
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  170404222

BEFORE:  OLSON, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY NICHOLS, J.:          **FILED SEPTEMBER 28, 2023**

Appellants Jordan Nemeroff and Elyssa Nemeroff appeal from the order determining the intent of the parties with respect to portions of the parties' settlement agreement, directing the parties to comply with the trial court's September 24, 2019 order, and denying Appellants' motion to vacate. Appellants argue that the trial court erroneously interpreted the parties' settlement agreement, improperly denied Appellants' motion to vacate, and

failed to award pre-judgment interest to Appellant Jordan Nemeroff. We affirm.

The trial court summarized the underlying facts of this matter as follows:

Plaintiff Printfly Corporation ("Printfly") is a Pennsylvania Corporation with its headquarters located at 2727 Commerce Way, Philadelphia, PA 19154. Defendant Jordan [Nemeroff] is an adult individual located at 1366 Gabriel Lane, Warwick, PA 18974. Defendant Elyssa [Nemeroff] is an adult individual located at 1366 Gabriel Lane, Warwick, PA 18974. Printfly has three shareholders, with ownership interests as follows: (1) Michael Nemeroff ("Michael") is the CEO of Printfly and owns forty percent (40%) of Printfly's outstanding shares; (2) Alexis Nemeroff ("Alexis") owns twenty percent (20%) of Printfly's outstanding shares; and (3) Jordan owns forty percent (40%) of Printfly's outstanding shares.

After litigation and negotiation, the parties participated in mediation on January 9, 2019 and agreed to terms memorialized in a Settlement Agreement term sheet ("Settlement Agreement"). Pursuant to paragraphs 1(a) and 2(b) of the Settlement Agreement, Jordan is to be "paid deferred compensation from Printfly in an amount that will allow him to receive a net of [$8 million] after taxes." However, the parties were unsuccessful in reaching a fully comprehensive agreement that was referenced in the Settlement Agreement after January 10, 2019.

After filings by both parties regarding enforcement of the Settlement Agreement, this court held a hearing where the parties jointly drafted and submitted to the court an order to enforce the Settlement Agreement, which this court entered on September 24, 2019. The September 24, 2019 order states that the terms of the Settlement Agreement "shall be afforded their plain meaning" and that the parties will "cooperate in a commercially reasonable manner to effectuate the terms" of the Settlement Agreement.

On October 2, 2019, Jordan had his tax attorney provide his calculations to Printfly's accountants, which required Printfly to make a "gross-up payment" to Jordan by "paying him as deferred compensation" instead of writing a check for $6.5 million, net of taxes. The calculations required that the payment due be "grossed up" to account for the federal, state, and local taxes due

- 2 -

on such compensation. On October 4, 2019, Printfly began performing under the court's September order. Specifically, Printfly sought Jordan's Counsel Richard Pressman's ("Pressman") escrow wiring instructions to deposit the $6.5 million due pursuant to Paragraph 1(a) of the Settlement Agreement. On October 7, 2019, Printfly hand delivered a check for $6,500,000, net of taxes, to Pressman's office, and on October 9, 2019, notified the court of the same. Jordan refused to accept the check as the payment was made as stock redemption instead of deferred compensation.

Thereafter, on October 11, 2019, Jordan filed a motion for contempt and sanctions. On October 30, 2019, Printfly responded and filed a cross-motion for contempt and sanctions. On January 30, 2020, this court ordered the parties to attend a second mediation with Judge Diane M. Welsh (Ret.) to clarify the meaning of the disputed term "deferred compensation." On July 30, 2020, after mediation with Judge Welsh failed, Printfly attempted to pay Jordan pursuant to Paragraphs 1(a), 1(b), and 1(c) of the Settlement Agreement.

On July 29, 2021, Printfly filed another motion for contempt and sanctions. On January 27-28, 2022, the court held a hearing to clarify the meaning of the disputed term "deferred compensation" included in the Settlement Agreement. On March 21, 2022, [Appellants] filed a motion to vacate the court's September 24, 2019 order. On June 9, 2022, the court entered the order disposing of (1) Plaintiff's July 29, 2021 motion for sanctions; (2) [Appellants'] October 11, 2019 motion for sanctions; and ([3]) [Appellants'] March 21, 2022 motion to vacate [the] September 24, 2019 order.

Trial Ct. Op., 9/5/22, at 1-4 (footnotes omitted).

Appellants filed a timely notice of appeal on July 8, 2022.[1] The trial court issued a Pa.R.A.P. 1925(a) opinion reiterating the basis for its June 9, 2022 order.

_____

[1] On September 30, 2022, this Court issued a rule to show cause order because it was unclear whether the order was a final order pursuant to Pa.R.A.P. 341(b)(1). In a response filed October 10, 2022, Appellants argued,
*(Footnote Continued Next Page)*

On appeal, Appellants raise the following claims:

1. Did the trial court commit error when it ignored the plain meaning of "deferred compensation" as wages, set forth in the dictionary, when it found that the parties did not intend the deferred compensation payments in Section 1 of the Settlement Agreement Term Sheet to be paid as wages?

2. Did the trial court commit error when it looked beyond the intent of the parties and rewrote the agreement by relying on (a) Printfly's expert's unsubstantiated, improper and inadmissible opinions, including her claims about how the Internal Revenue Service would view this transaction, and (b) arguments the parties did not know at the time of settlement might impact whether or not payments could properly be made as deferred compensation wages, including the fact that Jordan Nemeroff did not provide services to Printfly after he was terminated in 2017, and that Printfly did not have a deferred compensation plan?

3. Did the trial court commit error by excluding the presentation of evidence of alleged wrongdoing by Printfly and Michael and Alexis Nemeroff that informed Jordan Nemeroff's intent when structuring the deal as deferred compensation to minimize his legal and tax risk as a result of the alleged wrongdoing and the impact it could have on Printfly's S Corporation status and shareholder tax basis?

4. Did the trial court commit error by not vacating its September 24, 2019 order enforcing the Settlement Agreement Term Sheet when it was presented with evidence that there was no meeting of the minds regarding the definition of "deferred compensation", and both parties argued that forcing the other's definition of deferred compensation on them would cause them to violate tax laws?

---

*inter alia*, that the order constituted a final order because the order disposed of the parties' remaining disputes related to the September 24, 2019 order that enforced a settlement agreement term sheet. Based on Appellants' response, this Court subsequently discharged the rule to show cause order. **See** Order, 10/14/22.

5. Did the trial court commit error by not awarding Jordan Nemeroff interest on the money that Printfly has held for three years and could have wired to him at any time?

Appellants' Brief at 3-5.

**Interpretation of Settlement Agreement**

Appellants' first three claims relate to the trial court's interpretation of the settlement agreement. First, Appellants assert that the "only proper interpretation of the settlement agreement term sheet requires deferred compensation payments to be made as wages." Appellants' Brief at 29. In support, Appellants contend that Black's Law Dictionary (11th ed.) defines "deferred compensation" as wages. *Id.* at 30. Appellants also argue that given the plain meaning of the terms listed on the settlement agreement term sheet, "it is not plausible that 'deferred compensation' simply meant that the payments would be made later" because if the parties "simply meant that a certain amount would have been paid at a later date, they would have simply written that." *Id.* at 32. Appellants also claim that the parties' statements during the mediation and their conduct after the mediation indicate that the payments were to be paid as wages, rather than stock redemptions. *Id.* at 33-39.

Additionally, Appellants argue that the trial court erred by looking beyond the intent of the parties and rewriting the agreement based on "irrelevant arguments and inadmissible expert testimony about how the deal should have been structured," which did not relate to the parties' intent. *Id.* at 39. Specifically, Appellants refer to the report and testimony from Printfly's

expert regarding how the IRS would view the tax consequences of the settlement agreement, the tax risks for Appellants individually, Printfly's S Corporation status, and the validity and accuracy of Jordan's personal purported tax basis. *Id.* at 40. Finally, Appellants argue that the trial court erred in excluding "certain evidence about wrongdoing that Michael was involved in or aware of that might jeopardize Printfly's S Corporation status and Jordan's personal purported stock basis with the IRS." *Id.* at 52-53.

"The enforceability of settlement agreements is determined according to principles of contract law. Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation." ***Step Plan Servs., Inc. v. Koresko***, 12 A.3d 401, 408 (Pa. Super. 2010) (citation omitted).

> Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as [the appellate] court may review the entire record in making its decision. With respect to factual conclusions, we may reverse the trial court only if its findings of fact are predicated on an error of law or are unsupported by competent evidence in the record.

*Id.* (citations and quotation marks omitted).

> The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.

- 6 -

*Harley v. HealthSpark Found.*, 265 A.3d 674, 684 (Pa. Super. 2021) (citation omitted), *appeal denied*, 277 A.3d 1105 (Pa. 2022).

"Whether an ambiguity exists is a question of law subject to plenary review. However, resolution of conflicting parol evidence relevant to what the parties intended by an ambiguous provision is for the trier-of-fact." *PARC Holdings, Inc. v. Killian*, 785 A.2d 106, 112 (Pa. Super. 2001) (citations omitted).

"There is a strong judicial policy in favor of voluntarily settling lawsuits." *Felix v. Giuseppe Kitchens & Baths, Inc.*, 848 A.2d 943, 946 (Pa. Super. 2004) (citation omitted). "The primary reason that settlement is favored is that it expedites the transfer of money into the hands of a complainant. Further, settlement reduces the burden on and expense of maintaining courts." *Id.* (citations omitted).

In a settlement agreement, "[t]here is an offer (the settlement figure), acceptance, and consideration (in exchange for the plaintiff terminating his lawsuit, the defendant will pay the plaintiff the agreed upon sum)." *Step Plan Servs.*, 12 A.3d at 409 (citation omitted). "As with any contract, it is essential to the enforceability of a settlement agreement that the minds of the parties should meet upon all the terms, as well as the subject-matter, of the agreement." *Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999) (quotation marks, citation, and brackets omitted).

It is well settled that questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the

court's decision absent a clear abuse of discretion. ***Commonwealth Fin. Sys., Inc. v. Smith***, 15 A.3d 492, 496 (Pa. Super. 2011). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." ***Keystone Dedicated Logistics, LLC v. JGB Enters., Inc.***, 77 A.3d 1, 11 (Pa. Super. 2013) (citation omitted). In addition, "to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." ***Winschel v. Jain***, 925 A.2d 782, 794 (Pa. Super. 2007) (citation and brackets omitted).

Finally, when judges serve as the finder of fact, the law presumes they will disregard inadmissible and/or prejudicial evidence. ***See, e.g., Commonwealth v. Fears***, 836 A.2d 52, 71 n.19 (Pa. 2003) (holding that "a judge, as fact finder, is presumed to disregard inadmissible evidence and consider only competent evidence" (citation omitted)); ***In re J.H.***, 737 A.2d 275, 279 (Pa. Super. 1999) (noting that in a proceeding where the judge is the fact finder, he or she is presumed to consider evidence for its proper purpose and "is equipped, through training and experience, to assess the competency and relevance of proffered evidence and to disregard that which is prejudicial" (citation omitted)).

Here, after the trial court imposed its September 24, 2019 order directing the parties to cooperate in a commercially reasonable manner to effectuate the settlement agreement, the parties made several attempts to

resolve their disputes concerning the meaning of deferred compensation. This included court-ordered mediation with Judge Dianne Welsh (Ret.), on July 30, 2020, which was unsuccessful, as well as the January 27 to 28, 2022 hearings related to the enforcement of the settlement agreement. Despite these robust efforts, the parties were unable to agree on a definition of "deferred compensation."

Thereafter, further litigation ensued, including the filing of cross-motions for contempt and sanctions. The trial court subsequently conducted a hearing on March 21, 2022 to resolve these conflicts and effectuate the settlement agreement. Ultimately, the trial court explained its interpretation of the settlement agreement in its June 9, 2022 order, which disposed of all pending motions including cross motions for contempt, sanction, and Appellants' motion to vacate the trial court's September 24, 2019 order. ***See*** Trial Ct. Order, 6/9/22.

In its Rule 1925(a) opinion, the trial court explained:

[T]he parties dispute whether the payments under paragraphs 1(a) and 1(b) of the Settlement Agreement should be treated as deferred compensation payments or stock redemption payments for tax purposes. The Settlement Agreement [] provides in relevant part, as follows:

1) In exchange for the consideration set forth herein Jordan will surrender all of his shares in Printfly Corporation to Printfly Corporation and Jordan will be paid as follows:

a. Will be paid deferred compensation from Printfly in an amount that will allow him to receive a net of $6.5 million after taxes, to be paid within 120 days of a fully executed settlement agreement;

- 9 -

    b. Will be paid deferred compensation from Printfly in an amount that will allow him to receive a net of $1.5 million after taxes, to be paid on or before February 15, 2020;

According to Printfly, the term "deferred compensation" under paragraphs 1(a) and 1(b) of the Settlement Agreement is undefined, and the "deferred compensation" meant making payment at a later time "in an amount that will allow him to receive a net of $6.5 million after taxes" based on the plain meaning of the term. Therefore, the payments totaling $8,229,242 paid as stock redemption for tax purposes were, in fact, in an amount that would allow Jordan to receive a net of $8 million under the Settlement Agreement.

However, [Appellants] assert that the term "deferred compensation" should be interpreted under the IRS definition. Therefore, the net payment of $8,000,000 should be paid to him as "Deferred Compensation" for tax purposes. Specifically, Printfly needs to pay him in the amount of $12,600,000, based upon a grossed-up value of the after-tax payments due in the amount of $8 million at a 45% tax rate.

At the January 27-28, 2022 hearing, Printfly provided evidence to show that the term "deferred compensation" meant making payment at a later time. Specifically, there were no accountants in the room when the Settlement Agreement was reached and, according to Michael, "we wanted to give him a net number that he would receive after we figured out the best way to pay him, to make sure that he would get eight million in his pocket, after taxes" for his stock. Further, Michael testified that the payment being made as "wages" was never discussed, a deferred compensation plan did not exist at Printfly, Jordan was no longer employed by Printfly since 2017, and "the words that we said over and over . . . when we were talking about it was eight million after taxes and we're going to figure out the most tax efficient way to pay, to which Jordan said, yeah, I don't care how you pay me."

Joanne Yeung ("Yeung"), Printfly's accountant, testified as Printfly's expert that she reported the transaction as the redemption of stock by Printfly in 2019, and the IRS has not disputed the designation. According to Yeung, if Printfly makes a "grossed up wages" payment to Jordan and reports it as deferred compensation, the IRS would disallow it because Printfly has no deferred compensation plan, and the "grossed up wages" payment

will constitute an unreasonable compensation. Also, the IRS will recharacterize the payment as a stock redemption based on the economic substance of the transaction.

Meanwhile, Jordan provides that he understood he would receive deferred compensation payments as wages. According to Jordan, before signing the Settlement Agreement, Michael told him Printfly could pay him a $15 million payment in the form of deferred compensation so that Printfly could benefit from a tax write-off. Also, Pressman testified that "the agreement was reached based on an understanding that it was being treated as wages, because Michael wanted Printfly to be able to take advantage of the wage deductions that Printfly was going to pay to offset its taxes."

Instantly, the court interprets the Settlement Agreement in a commercially reasonable manner in accordance with the September 24, 2019 order. As the term "deferred compensation" is not defined in the Settlement Agreement, the court looks at extrinsic evidence to determine the intent of the parties. Upon examining the evidence, the court concluded that the parties intended that Section 1(a) and Section 1(b) of the Settlement Agreement meant that Jordan would be paid a net of $8 million. Michael testified that "when we were talking about it was eight million after taxes and we're going to figure out the most tax efficient way to pay, to which Jordan said, yeah, I don't care how you pay me." Also, Jordan agreed that the net proceeds he was entitled to would be $8 million and "not a penny more."

When negotiating the Settlement Agreement, the parties have not discussed the IRS definition of "deferred compensation." Specifically, Pressman testified that "we weren't looking at it under IRS guidelines with regards to whether or not it was deferred compensation plan." There were no accountants in the room when the Settlement Agreement was reached. Further, the term "wages" is not referenced in the Settlement Agreement. Moreover, Jordan did not provide services to Printfly after he was terminated in 2017, and Printfly did not have a deferred compensation plan in place at any time before or after entering into the Settlement Agreement. With respect to Jordan's concerns that treating the payments as stock redemption would subject him to additional legal and tax risks, Yeung has performed research on Jordan's concerns of disproportionate distributions and S-Corp

issues and testified that there is no tax risk associated with reporting the payment as a stock redemption.[2]

Therefore, the court properly concluded in June 9, 2022 order that 1) the parties intended that Section 1(a) and Section 1(b) of the Settlement Agreement reached on January 10, 2019 meant that Jordan would be paid a net of eight million dollars ($8,000,000) after taxes in exchange for his shares in Printfly, and 2) the parties did not intend that the payments in Section 1 be defined as "wages" or an IRS definition of "compensation." Accordingly, the court's interpretation of the Settlement Agreement comports with the ordinary meaning of the term and in accordance with a commercially reasonable manner.

Trial Ct. Op. at 5-8 (footnotes omitted and some formatting altered).

Following our review of the record, we agree with the trial court and conclude that the term "deferred compensation" was ambiguous, as it was subject to more than one reasonable interpretation when applied to the facts of the instant case. *See Harley*, 265 A.3d at 684; *PARC Holdings, Inc.*, 785 A.2d at 112. As such, the trial court properly considered evidence outside of the agreement to determine the parties' intent. *See Harley*, 265 A.3d at 684.

After considering the evidence and hearing argument from both parties, the trial court made a factual determination that the parties had intended to structure the settlement agreement so that Jordan would receive eight million dollars after taxes. *See* Trial Ct. Op. at 8. In reaching that conclusion, the trial court noted that Printfly did not have a deferred compensation plan,

_____

[2] Further, the record reflects that Printfly offered to pay their accountant to "handle Jordan's tax returns for 2018, 2019, and 2020, to ensure he [had] no additional tax liability, and to pay any liability (if any) that [would arise] from the money he [was] receiving from Printfly." R.R. at 1979a.

Jordan had not been employed by Printfly since 2017, and there was no indication that the parties had made any reference to "wages" when creating the settlement agreement term sheet. **See id.** The trial court's factual findings are supported by the record and we will not disturb them on appeal. **See PARC Holdings, Inc.**, 785 A.2d at 112 (explaining that the "resolution of conflicting parol evidence relevant to what the parties intended by an ambiguous provision is for the trier-of-fact" (citation omitted)).

Finally, there is no indication that the trial court relied on "inadmissible" or "irrelevant" evidence when making its factual determinations in this case. **See Fears**, 836 A.2d at 71 n.19 (stating that "a judge, as fact finder, is presumed to disregard inadmissible evidence and consider only competent evidence" (citation omitted)). Therefore, because we discern no abuse of discretion by the trial court, Appellants are not entitled to relief. **See Commonwealth Fin. Sys., Inc.**, 15 A.3d at 496.

**Motion to Vacate**

Appellants also contend that the trial court erred in denying their motion to vacate. Appellants' Brief at 54. Specifically, Appellants argue that after the trial court concluded that the payments could not be made as deferred compensation wages, the court should have vacated its September 24, 2019 order and sent the parties back to litigation rather than rewriting the settlement agreement. **Id.** at 56. In support, Appellants claim that there was no meeting of the minds concerning the material terms of the settlement agreement, and that "if the trial court believed that it could not force Printfly

- 13 -

to pay Jordan wages because he provided no services post-termination, or there was no deferred compensation plan, its remedy was not to rewrite the [agreement], but to find it unenforceable and to send the parties back to litigation." ***Id.***

In ruling on Appellants' motion to vacate, the trial court explained:

[Appellants] also appeal this court's June 9, 2022 order disposing of [Appellants'] Motion to Vacate. In the Motion to Vacate, [Appellants] seek to vacate the court's September 24, 2019 order and claim that: (1) there was no meeting of the minds as to the material terms of the Settlement Agreement; and (2) the Settlement Agreement is void because enforcement of the Agreement requires Printfly to make deferred compensation payments to Jordan, which will cause Printfly to take a position that violates IRS regulations.

Judicial policy favors the settlement of lawsuits and in the absence of fraud and mistake the courts will enforce an agreement to settle a legal dispute. ***Greentree Cinemas, Inc. v. Hakim***, 432 A.2d 1039 (Pa. Super. 1981). The enforceability of settlement agreements is governed by principles of contract law. ***Mazzella***, 739 A.2d at 536. If all of the material terms of a bargain are agreed upon, the settlement agreement will be enforced. ***See id.*** at 537. If, however, there exist "ambiguities and undetermined matters which render a settlement agreement impossible to understand and enforce," such an agreement must be set aside. ***Id.*** [(citation omitted).] If there is an ambiguity, "extrinsic or parol evidence may be considered to determine the intent of the parties . . . it is for the fact finder to resolve ambiguities and find the parties' intent." ***See Metzger v. Clifford Realty Corp.***, 476 A.2d 1, 5 (Pa. Super. 1984) [(citations omitted)]. Also, "a true and actual meeting of the minds is not necessary to form a contract. In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions[,] that matter." ***Ingrassia Constr. Co., Inc. v. Walsh***, 486 A.2d 478, 482-83 (Pa. Super. 1984) [(citations omitted)].

As discussed above, the parties intended that Section 1(a) and Section 1(b) of the Settlement Agreement meant that Jordan

- 14 -

would be paid a net of $8 million after taxes. Since the court has resolved any ambiguities in the Settlement Agreement upon examining the evidence, nothing renders the Settlement Agreement impossible to enforce and must be set aside. Therefore, there was a meeting of the minds regarding the material terms of the Settlement Agreement, and [Appellants'] argument has been properly denied.

\*     \*     \*

Under Pennsylvania law, a "contract which violates a statute is illegal and will not be enforced." **Robinson Coal Co. v. Goodall**, 72 A.3d 685, 690 (Pa. Super. 2013) [(citation omitted)]. An agreement will be considered void for illegality where it "cannot be performed without violating a statute." **Rittenhouse v. Barclay White Inc.**, 625 A.2d 1208, 1211 (Pa. Super. 1993) [(citations omitted)].

[Appellants] claim that if the court enforces the Settlement Agreement as written and requires Printfly to make deferred compensation payments to Jordan, it will cause Printfly to take a position that violates IRS regulations.

As explained above, the court interprets that the parties did not intend that the payments in Section 1 be defined as "wages" or an IRS definition of "compensation." Accordingly, the terms of the Settlement Agreement would be enforced without violating the IRS rules. Therefore, [Appellants'] argument that enforcing the Settlement Agreement would violate the law has been properly denied.

Trial Ct. Op. at 8-10 (some formatting altered).

Following our review of the record, the parties' briefs, and the trial court's opinion, we affirm based on the trial court's analysis of this issue. **See id.** Specifically, we agree with the trial court's conclusion that although there was an ambiguity in the settlement agreement as to the meaning of deferred compensation, it did not render the agreement unenforceable. **See Step Plan Servs., Inc.**, 12 A.3d at 408. As noted previously, the trial court, as fact

- 15 -

finder, reviewed the parties' evidence and determined the parties' intent and resolved the ambiguity with respect to the term "deferred compensation." *See* Trial Ct. Op. at 8-10. Therefore, the trial court did not err in denying Appellants' motion to vacate.

**Pre-Judgment Interest Award**

In their final claim, Appellants argue that the trial court erred in declining to award Jordan pre-judgment interest. Appellants' Brief at 56. Appellants claim that Printfly had Jordan's wire instructions since 2019 and "could have wired the money to him at any point." *Id.* at 58. Appellants assert that "[i]nstead of wiring the money to Jordan, Printfly concocted a scheme of attempting to get him to deposit checks so that they could argue that Jordan had accepted their characterization of the deal and gross up calculations as a stock redemption." *Id.* Therefore, Appellants conclude that Jordan is entitled to interest on the funds dispersed in accordance with the settlement agreement. *Id.* at 59.

In Pennsylvania, a party is entitled to pre-judgment interest as a matter of law in cases where:

> (1) a defendant commits a breach of a contract to pay a definite sum of money; or
>
> (2) a defendant commits a breach of contract to render a performance the value of which in money is stated in the contract; or
>
> (3) a defendant commits a breach of contract to render a performance the value of which is ascertainable by mathematical calculation from a standard fixed in the contract; or

(4) a defendant commits a breach of a contract to render a performance the value of which in money is ascertainable from established market prices of the subject matter[.]

***Davis v. Borough of Montrose***, 194 A.3d 597, 613 (Pa. Super. 2018) (citation omitted).  In all other cases, "pre-judgment interest is awarded at the court's discretion[.]" ***Id.***

In the instant case, there is no indication that Appellees breached the parties' settlement by failing to pay Jordan a definite sum of money.  Indeed, the parties were involved in litigation to determine whether the term "deferred compensation" meant that Jordan was to be paid in wages or in exchange for his stock redemption.  Further, as noted by the trial court, Printfly attempted to pay Jordan pursuant to paragraphs 1(a), 1(b), and 1(c) of the settlement agreement, but Jordan refused to accept payment.[3]  ***See*** Trial Ct. Op. at 4. Under these circumstances, we discern no abuse of discretion by the trial court in declining to award Jordan pre-judgment interest.  ***See Davis***, 194 A.3d at 613.  Therefore, Appellants are not entitled to relief on this issue.  Accordingly, we affirm.

Order affirmed.  Jurisdiction relinquished.

_____

[3] As noted previously, Printfly also offered to indemnify Jordan, and stated that they would pay their accountant to "handle Jordan's tax returns for 2018, 2019, and 2020, to ensure he [had] no additional tax liability, and to pay any liability (if any) that [would arise] from the money he [was] receiving from Printfly."  R.R. at 1979a.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: _9/28/2023_